## UNITED STATES DISTRICT COURT DISTRICT
## SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Gary Spano, John Bunk, James White, Jr. and Victor Dubbs, as representatives of a class of similarly situated persons, and on behalf of the Plan, | ) ) ) ) ) ) | |
| Plaintiffs; | ) ) | Cause No: 06-743-JLF |
| v. | ) ) | |
| The Boeing Company, Employee Benefits Plans Committee, and Scott M. Buchanan, | ) ) ) ) ) ) | **JURY TRIAL DEMANDED ON ALL COUNTS AND ISSUES SO TRIABLE** |
| Defendants. | ) | |

## COMPLAINT FOR BREACH OF FIDUCIARY DUTY

### INTRODUCTION

1.      Personal savings accounts, such as 401(k)s, are quickly becoming employees' primary method of financially planning for retirement.  An increasing number of companies recently have announced the termination of traditional defined benefit pension plans and their replacement by defined contribution 401(k) plans.  For many employees in the United States today, an employer-provided defined benefit pension awaiting their retirement is a quaint, historical notion.

2.      In 401(k) plans, employers provide an opportunity for employees to save their own pre-tax dollars in individual 401(k) accounts.  The accounts provide a number of investment alternatives into which employees place a portion of their current income with the hope of earning, over time, a return sufficient to support themselves and their families in retirement.

3.      Accordingly, in 401(k) plans, the return on employees' investments is critical. Even seemingly small reductions in a participant's return in one year may substantially impair his or her accumulated savings at retirement.

4.      While such reductions in 401(k) accounts' returns may result from market fluctuations, a consistent, albeit rarely discussed, force reducing 401(k) accounts' earnings is the administrative fees and expenses assessed against account balances.

5.      The most certain means of increasing the return on employees' 401(k) savings to reduce the fees and expenses employees pay from their 401(k) accounts.

6.      Unlike generalized market fluctuations, employers can control these fees and expenses.  Federal law requires them to do so.

7.      Under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq*. ("ERISA"), an employer who provides a 401(k) plan for its employees is a "Plan Sponsor."  The employer or its agent may also serve as "Plan Administrator," or the employer may appoint a third party to serve as such.  Both the Plan Sponsor and the Plan Administrator are fiduciaries of the 401(k) plan.  The Plan Administrator performs or contracts for administrative, record-keeping, investment management, and other services from entities in the financial and retirement industry.  ERISA requires that the fees for these services must be reasonable, incurred solely for the benefit of Plan participants, and fully disclosed.

8.      For providing various services, third-party plan administrators, record-keepers, consultants, investment managers, and other vendors in the 401(k) industry have developed a variety of pricing and fee structures.

9.      At best, these fee structures are complicated and confusing when disclosed to Plan participants.  At worst, they are excessive, undisclosed, and illegal.

10.     In this action,  pursuant to ERISA § 502(a),  29 U.S.C. § 1132(a), Plaintiffs and Class Representatives Gary Spano, John Bunk, James White, Jr., and Victor Dubbs, on behalf of The Boeing Company Voluntary Investment Plan (the "Plan") and similarly situated participants and beneficiaries in the Plan, seek to recover the losses suffered by the Plan and to obtain injunctive and other equitable relief for the Plan from The Boeing Company ("Boeing"), the Plan Sponsor, the Employee Benefit Plans Committee (the "Committee"), the Plan Administrator, and other defendants identified below based upon breaches of their fiduciary duties (collectively "Defendants").

11.     As set forth in detail below, the fees and expenses paid by the Plan, and thus borne by Plan participants, were and are unreasonable and excessive; not incurred solely for the benefit of the Plan and its participants; and undisclosed to participants.  By subjecting the Plan and its participants to these excessive fees and expenses, and by other conduct set forth below, Defendants violated their fiduciary obligations under ERISA.

## PARTIES, JURISIDCTION AND VENUE

### Plaintiffs:

12.     Plaintiff and Class Representative Gary Spano is a resident of Godfrey, Illinois, and this District.

13.     Plaintiff and Class Representative John Bunk is a resident of Shipman, Illinois.

14.     Plaintiff and Class Representative James White, Jr. is a resident of St. Peters, Missouri.

15.     Plaintiff and Class Representative Victor Dubbs is a resident of St. Clair, Missouri.

16.     Each Plaintiff and Class Representative is a participant in the Plan.

**Defendants:**

17.     Defendant The Boeing Company has its headquarters in Chicago, Illinois and employs approximately 153,800 employees in 48 states and 67 countries.  Boeing's major operations are in the Puget Sound area of Washington State, southern California, and St. Louis. Total revenues for Boeing in 2005 were $54.8 billion.

18.     According to its website, Boeing is organized into three business units: Boeing Commercial Airplanes, Boeing Integrated Defense Systems, and Boeing Capital Corporation. Supporting these units is the Shared Services Group, which provides a broad range of services to Boeing worldwide, and Boeing Engineering, Operations & Technology, which helps develop, acquire, apply, and protect innovative technologies and processes.

19.     Boeing is Plan Sponsor pursuant to ERISA § 3(16) and the Plan document.

20.     Defendant Employee Benefit Plans Committee (the "Committee") is the Plan Administrator pursuant to ERISA § 3(16) and the Plan document.  The Committee is comprised of Boeing officers and employees.  Committee members serve at the appointment and discretion of Boeing's Board of Directors.

21.     Defendant Scott M. Buchanan is Boeing's Director of Benefits Delivery and the individual designated by Boeing to sign as Plan Administrator of the Plan for filings with government regulators.

**Jurisdiction and Venue:**

22.     Plaintiffs bring this action pursuant to ERISA §§ 502(a)(2), (3), 29 U.S.C. §§1132(a)(2), (3), which provides that participants may pursue civil actions on behalf of the Plan to remedy breaches of fiduciary duty as set forth in ERISA § 409, 29 U.S.C. § 1109, and to

4

obtain other appropriate equitable relief.  This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(2).

23.     All Defendants are subject to service of process issued from this Court pursuant to 29 U.S.C. § 1132(e)(1).

24.     Venue is proper in this Court pursuant to 29 U.S.C. § 1132 (e)(2) because breaches of fiduciary duty giving rise to this action occurred in this district and this division of the district in that Plaintiff and Class representative Gary Spano resides in this district, participated in the Plan from this district, received statements, Plan summaries, and other information from the Defendants in this district and suffered damages in this district.

### Rule 23 Requires Class Certification:

25.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and all similarly situated Plan participants and beneficiaries. They seek to represent the following class (the "Class"):

> All persons, *excluding the Defendants, and other individuals who are or may be liable for the conduct described in this Complaint,* who are or were participants or beneficiaries of the Plan and who are, were, or may have been affected by the conduct set forth in this Complaint, as well as those who will become participants or beneficiaries of the Plan in the future.

26.     Certification of this Class is proper under Rule 23(a) in that:

A. **Numerosity.**  The members of the Class are so numerous that joinder of all members is impracticable.  Although the Plaintiffs do not know the exact number of Class members as of the date of filing, the Plan's public documents state that, at the end of the 2004 Plan year, there were 189,577 participants with account balances in the Plan.

B. **Commonality.** Common issues of fact and law predominate over any issues unique to individual Class members.  Issues that are common to all Class members include, but are not limited to, whether the Defendants:

    i.    Charged fees and expenses to the Plan that were, or are, unreasonable or not incurred solely for the benefit of Plan participants;

    ii.    Caused the Plan to enter into agreements with third-parties that caused or allowed the Plan to pay fees and expenses that were, or are, unreasonable or not incurred solely for the benefit of Plan participants;

    iii.    Failed to monitor the fees and expenses paid by the Plan and, by such failure, caused or allowed the Plan to pay fees and expenses that were, or are, unreasonable or not incurred solely for the benefit of Plan participants;

    iv.    Failed to inform themselves of, and understand, the various methods by which vendors in the 401(k), financial and retirement industry collect payments and other revenues from 401(k) plans;

    v.    Failed to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plan were reasonable and incurred solely for the benefit of Plan participants;

    vi.    Failed properly to inform, or disclose to, Plan participants the fees and expenses that are, or have been, paid by the Plan;

vii.   Failed to inform, or disclose to, Plan participants in proper detail and clarity the transaction fees and expenses that affect participants' accounts balances in connection with the purchase or sale of interests in investment alternatives;

viii.  Breached their fiduciary duties by failing to disclose that hidden and excessive fees were and are being assessed against Plan assets and by failing to stop such hidden excessive fees;

ix.    In charging, causing to be charged or paid, and failing to monitor the fees and expenses of the Plan, failed to exercise the care, skill, prudence, and diligence that a prudent person would when acting in like capacity and familiar with such matters;

x.     Caused or allowed fees and expenses to be paid by the Plan for purposes other than those allowed by ERISA;

xi.    By the conduct above and by other conduct set forth in this Complaint, revealed in discovery or proven at trial, breached their fiduciary and other ERISA-imposed obligations to the Plan, Plan participants, and members of the Class;

xii.   Are liable to the Plan and the Class for losses suffered as a result of the breaches of their breached their fiduciary and other ERISA-imposed obligations; and

xiii.  Are responsible to account for the assets and transactions of the Plan and should be charged/surcharged for any transactions and payments for which they cannot account.

C. **Typicality.**  The claims brought by the Plaintiffs are typical of those of the absent Class members, in that:

    i.    The Defendants owed the exact same fiduciary and other ERISA-based obligations to each Plan participant and beneficiary, and each member of the Class;

    ii.    The Defendants' breach of those obligations constitutes a breach to each participant and beneficiary, and each member of the Class;

    iii.    To the extent that there are any differences in Class members' damages, such differences would be a product of simple mathematics based upon account balances in the Plan.  Such minimal and formulaic differences are no impediment to class certification.

D. **Adequacy of Representation.**  The Plaintiffs are adequate representatives of the absent Class members and will protect such absent Class members' interests in this litigation.  The Plaintiffs do not have any interests antagonistic to the other Class members and they do not have any unique claims or defenses that might undermine the efficient resolution of the Class' claims.  Plaintiffs have retained competent counsel, versed in ERISA, class actions, and complex litigation.

27.    Class certification is also appropriate under Rule 23(b) and each subpart in that:

A. Pursuant to Rule 23(b)(1)(A), in the absence of certification, there is a risk of inconsistent adjudications with respect to individual class members;

B.   Pursuant to Rule 23(b)(2), as set forth above, the Defendants have acted on

grounds generally applicable to the Class as a whole; and

C.   Pursuant to Rule 23(b)(3), as set forth above, common issues of law and fact

predominate over any purely individual issues and thus a class action is

superior to any other method for adjudicating these claims.

## FACTS APPLICABLE TO ALL COUNTS

### The Plan

28.   As part of their compensation and benefits, Boeing offers certain of its employees

the opportunity to participate in the Plan.  The Plan is a "defined contribution plan," as defined in

ERISA § 3(34), 29 U.S.C. § 1002(34), and contains or is part of an "eligible individual account

plan" under ERISA § 407(d)(3)(A), 29 U.S.C. §1107(d)(3)(A).  It is also a tax-qualified plan of

the type popularly known as a "401(k) plan."

29.   Boeing benefits by providing the Plan to eligible employees in that the

opportunity to participate enhances Boeing's ability to recruit and retain qualified personnel,

fosters employee loyalty and goodwill, and entitles Boeing to tax advantages under the Internal

Revenue Code.

30.   According to the Summary Plan Description ("SPD"):

The Company recognizes that employees have different financial goals.  For one
employee, this Plan might help build up a reserve to supplement future retirement
income.  For another, saving through the Plan might provide the resources to meet short-
term financial goals such as college educations for children or buying a house.
Generally, the Plan is designed to supplement your other sources of income in retirement
such as your personal savings and investments as well as any income you receive from
the Federal Social Security Program.

31.   Boeing has designed the Plan, combined with the certain other Boeing defined

contribution plans, to be administered through a master trust pursuant to the Master Trust

Agreement Between The Boeing Company and State Street Bank and Trust Company as of
October 1, 1997 as thereafter amended (the "Master Trust").

32.     A master trust is a separate trust entity established by an employer or group of
related employers to provide investment and administrative services to a 401(k) plan or plans.
Plan sponsors and administrators generally utilize master trusts to administer multiple 401(k)
plans for an employer or related-employer group (*e.g.* a company or related companies that
maintain salaried and hourly employee plans; plans formerly sponsored or administered by a
company that the employer has acquired or with whom the employer has merged; plans which
include only employees of a bargaining unit or represented by a labor organization, etc.).

33.     Through a master trust structure, several 401(k) plans may invest in common
investment options or funds offered in the master trust and may share the services of master trust
record-keepers, investment managers, consultants, and other service providers.  The fees
incurred for such services typically are allocated among participating plans based upon each
plan's proportionate share of the assets in the master trust.

34.     The Plan's assets comprise approximately 94 percent of the assets in the Master
Trust.

35.     According to the Master Trust's audited financial statements filed with federal
regulators:

> The Boeing Company (the "Company") Employee Savings Plans Master Trust (the
> "Master Trust"), facilitates the commingling of employee benefit plan assets for
> investment and administrative purposes.  Eligible participants are defined by the plans as
> Members. . . . State Street Bank and Trust Company ("SSBT") serves as the trustee for
> the Master Trust.
>
> * * *
>
> Each Plan participating in the Master Trust has an interest in the net assets of one or more
> Master Trust investment funds and the changes therein.  The assets are invested and

managed jointly and then allocated between six Plans.  The allocation of net assets available for benefits is based on the respective number of units held by the Plans' Members as of plan year-end.  The allocation of the changes in net assets available for benefits is calculated daily based on the units held by the Plans' Members as of that day's end.

36.     According to the Plan's audited financial statements filed with federal regulators

and the SPD:

> **Contributions**—Members may elect to contribute, subject to statutory limitations, between 1 percent and 20 percent, depending upon the employee's labor group code, of their base compensation.  Certain eligible employees are allowed to make catch-up contributions.  This provision is available to participants age 50 or older during the plan year and who contribute either 8 percent in pretax contributions or have reached a specified limit for the plan year.  The funds are valued daily.  Members may elect to change contribution percentages to be effective the next pay period after the request is received or as soon as administratively possible.  The allocation of both their contributions and employer contributions to the funds may be changed at any time and become effective on the day of the change or the next business day according to the stock market close of business.  The Plan allows active employees to contribute to the Plan from pretax compensation, after-tax compensation, or a combination of both.  The Plan also accepts certain rollover contributions.

37.     According to the Plan's audited financial statements filed with federal regulators

and the SPD:

> **Members' Accounts**—Individual accounts are maintained for each Plan Member.  Each Member's account is credited with the Member's contribution and Company's contribution, allocations of Plan earnings (losses), and charged with an allocation of certain administrative expenses.  Allocations are based on Member earnings or account balances, as defined.  The benefit to which a Member is entitled is the benefit that can be provided from the Member's vested account.

38.     According to the Plan's audited financial statements filed with federal regulators

and the SPD:

> **Vesting**—Member contributions, both pretax and after-tax, employer matching contributions, profit sharing contributions, and earnings on those contributions are immediately vested.

39.     According to the Plan's audited financial statements filed with federal regulators:

**Expenses**—Necessary and proper expenses of the Plan are paid from the Plan assets at the Master Trust level except for those expenses the Company is required by law or chooses to pay.

40. According to the SPD, participants may choose to invest in any of the 19

investment options available under the Plan:

**Investment Funds**

- Lifecycle Retirement Fund

- Lifecycle 2010 Fund

- Lifecycle 2020 Fund

- Lifecycle 2030 Fund

- Lifecycle 2040 Fund

- Bond Market Index Fund

- Balanced Index Fund

- S&P 500 Index Fund

- Russell 2000 Index Fund

- International Index Fund

- VIP Stable Value Fund

- Large Companies Value Fund

- Large Companies Core Fund

- Large Companies International Fund

- Small/Mid Companies Value Fund

- Small/Mid Companies Growth Fund

- Science and Technologies Fund

- Boeing Stock Fund

41. According to the SPD, the Boeing Stock Fund:

invests its assets almost entirely in common stock of The Boeing Company. The fund also holds a small amount in cash or cash equivalents to reduce the need to sell Boeing stock for fund redemptions. The cash position is targeted to be in the 1 to 2 percent range; however, it may fall outside of that range due to participant activity.

42. According to the SPD, nonunion employees and union-represented employees

whose unions have adopted the dividend payout program are invested in the Boeing ESOP Stock

Fund, which means they have the option of receiving their dividends in cash instead of having

the dividends automatically reinvested.  "Union-represented employees whose unions have not

adopted the program are still in the Boeing Traditional Stock Fund," where dividends are

reinvested automatically.  "The unit value of the Boeing Stock fund was based on the total

combined market value of these two funds."

43.     In the Plan Document, Boeing agrees to indemnify the Committee and individual

employees, officers, and members to the fullest extent provided in the by-laws of The Boeing

Company.

### Defendants' Fiduciary Duties To The Plan Under ERISA

44.      ERISA §403(c)(1), 29 U.S.C. §1103(c)(1), unambiguously mandates that:

[T]he assets of a plan shall never inure to the benefit of any employer and shall be

held for the **exclusive purposes of providing benefits** to participants in the plan

and their beneficiaries **and defraying reasonable expenses of administering the**

**plan.**

(Emphasis added).

45.     ERISA §§ 404(a)(1)(A)& (B) , 29 U.S.C. § 1104(a)(1)(A), (B), require that Plan

fiduciaries, including Defendants, "shall discharge [their] duties with respect to a plan solely in

the interest of the participants and beneficiaries" and:

A.     [F]or the exclusive purpose of:

i.     providing benefits to participants and their beneficiaries; and

ii.     defraying reasonable expenses of administering the plan; and

B.     [W]ith the care, skill, prudence, and diligence under the circumstances

then prevailing that a prudent man acting in a like capacity and familiar with

such matters would use in the conduct of an enterprise of a like character and with like aims.

46.     ERISA § 406, 29 U.S.C. § 1106, prohibits certain transactions between the Plan and "parties in interest."  Unless subject to an exemption set forth in ERISA § 408, 29 U.S.C. §1108, a fiduciary

> shall not cause the plan to engage in a transaction …if he knows or should know that such a transaction constitutes a direct or indirect – sale or exchange, or leasing, of any property between the plan and a party in interest …furnishing of goods, services or facilities between the plan and a party in interest …transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan.
>
> 29 U.S.C. § 1106(a)(1).

47.     For purposes of section 406, a "party in interest" is any plan fiduciary, including the plan administrator, trustee, officer or custodian, any plan services provider, the employer, a relative of any of the above, and certain persons with ownership or leadership roles in any of the above.  ERISA § 3(14), 29 U.S.C. § 1002(14).

48.     Similarly, a fiduciary (1) shall not "deal with the assets of the plan in his own interest or for his own account;" (2) shall not "act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interest of the plan" or its participants and beneficiaries; and (3) shall not "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."  29 U.S.C. § 1106(b).

49.     ERISA §104(b)(1), 29 U.S.C. § 1024(b)(1), requires that the Plan Administrator periodically provide to Plan participants and beneficiaries a summary plan description.

50.     ERISA §104(b)(3), 29 U.S.C. § 1024(b)(3), requires that the Plan Administrator at least annually provide to Plan participants and beneficiaries copies of statements and

schedules from the Plan's annual report for the previous year, and such additional information "as is necessary to fairly summarize the latest annual report."

51.     The schedules and statements that the Plan Administrator annually must provide to Plan participants and beneficiaries specifically include:

> A.  [A] statement of the assets and liabilities of the plan aggregated by categories and valued at their current value, and the same data displayed in comparative form for the end of the previous fiscal year of the plan; and
>
> B.  [A] statement of receipts and disbursements during the preceding twelve-month period aggregated by general sources and applications.
>
> ERISA §103(b)(3), 29 U.S.C. §1023(b)(3).

52.     ERISA §104(b)(4), 29 U.S.C. § 1024(b)(4), entitles Plan participants and beneficiaries to receive more detailed information from the Plan Administrator on request:

> The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated.

53.     ERISA §§ 103(b)(2), (3), 29 U.S.C. §§ 1023(b)(2), (3) mandates that, among other extensive disclosures, Plan fiduciaries must include in the Plan's "Annual Report:"

> a statement of [the Plan's] assets and liabilities, and a statement of changes in net assets available for plan benefits which shall include details of revenues and expenses and other changes aggregated by general source and application.

54.     ERISA § 404(c), 29 U.S.C. § 104(c), provides to Plan fiduciaries a "safe harbor" from liability for losses that a participant suffers in his or her 401(k) account to the extent that

the participant exercises control over the assets in his or her 401(K) accounts.  To be eligible for the protection of this "safe harbor," Plan fiduciaries must, among other things, provide:

    A.    "an opportunity for a participant or beneficiary to exercise control over assets in his individual account," and

    B.    "a participant or beneficiary with an opportunity to choose, from a broad range of investment alternatives, the manner in which some or all of the assets in his account are invested."

29 C.F.R. §2550.404c-1(b)(1).

55.    For a participant or beneficiary to have "an opportunity to exercise control over assets in his individual account," Plan fiduciaries must provide him or her with "the opportunity to obtain sufficient information to make informed decisions with regard to investment alternatives under the Plan." 29 C.F.R. §2550.404c-1(b)(2)(B).

56.    The "sufficient investment information" Plan fiduciaries must provide includes:

    A.    "A description of any transaction fees and expenses which affect the participant's or beneficiary's account balance in connection with purchases or sales of interests in investment alternatives (e.g., commissions, sales load, deferred sales charges, redemption or exchange fees)." 29 C.F.R. §2550.404c-1(b)(2)(i)(B)(1)(v); and

    B.    At least upon request, "[a] description of the annual operating expenses of each designated investment alternative (e.g., investment management fees, administrative fees, transaction costs) which reduce the rate of return to participants and beneficiaries, and the aggregate amount of such expenses

expressed as a percentage of average net assets of the designated investment alternative." 29 C.F.R. §2550.404c-1(b)(2)(i)(B)(2)(i).

57.     ERISA's Safe Harbor Regulations state that the imposition of *reasonable* charges for *reasonable* Plan expenses does not interfere with a participant's opportunity to exercise control over his or her individual account so long as *Plan fiduciaries inform the participant* of such actual expenses:

> A plan may charge participants' and beneficiaries' accounts for the reasonable expenses of carrying out investment instructions, *provided that procedures are established under the plan to periodically inform such participants and beneficiaries of actual expenses incurred with respect to their respective individual accounts.*

29 C.F.R. §2550.404c-1(b)(2)(ii)(A) (emphasis added).

## The Fees and Expenses Assessed Against The Plan

58.     Either directly or through the Master Trust, Defendants have caused the Plan to purchase trustee, record-keeping, administration, investment management, brokerage, consulting, auditing, and other services from various institutions and entities.

59.     Either directly or through the Master Trust, Defendants have caused the amounts that the Plan pays for these services to be assessed against Plan participants' accounts.

60.     Either directly or through the Master Trust, Defendants have caused or allowed these services providers to receive payment in at least one of two ways:

> A.  By direct disbursement from the Plan or the Master Trust to the entity providing the service; or

B.  By receiving, or having the opportunity to receive, "Revenue Sharing" payments comprised of Plan assets distributed between or among various service providers.

**"Hard Dollar" Payments to Plan Service Providers**

61.     Payments in the form of direct disbursements from the Plan or the Master Trust to participants or an entity providing a service to the Plan or the Master Trust are characterized as "Hard Dollar" payments.

62.     Plan Sponsors, like Defendants, generally discloses to government regulators and Plan participants, in one form or another, Hard Dollar payments made from the Plan to service providers.

63.     When such disclosures are made, understanding the Plan's service provider expenses for a given year *appears* straightforward:  the Plan transfers funds in a stated amount to the provider in return for the provider's services.  From this, Plan participants and government regulators surmise that the Plan expended the stated amount in exchange for the services.

64.     In 2004, Boeing disclosed no Hard Dollar payments from the Plan to Plan service providers.  Obviously, the Plan contracted for services and paid service providers for them.

**"Hard Dollar' Expenses and Master Trusts**

65.     Because Boeing's administers the Plan through a Master Trust, the disclosure of Hard Dollar payments for services provided to the Plan is unclear, and may be  incomplete and inaccurate.

66.     These shortcomings arise because the Hard Dollar payments to *Plan* service providers are made *from the Master Trust* and reported to government regulators *only in connection with the Master Trust.*

67.     The *Plan's* disclosures to government regulators and participants do not include the Hard Dollar payments made to service providers *from the Master Trust*.  Those payments to service providers – because they are disbursed *from the Master Trust*– are reported in its disclosures to government regulators.  Details of such payments from the Master Trust are not routinely disclosed to Plan participants.

68.     As a result, it may appear to participants and government regulators that Hard Dollar payments made by the Plan to service providers in a given year were very small, or that the Plan did not incur such expenses at all.

69.     But, in actuality, substantial Hard Dollar payments *to plan service providers* may have been disbursed *from the Master Trust* and then allocated to the Plan.

70.     Even though such Hard Dollar payments are disbursed from the Master Trust, the Plan and its participants still pay them:  The Master Trust assesses the amount of these Hard Dollar payments against the Plan's assets held in the Master Trust.

71.     When Hard Dollar payments for Plan services are disbursed from the Master Trust, it becomes difficult, and sometimes impossible, for Plan participants to discern the amount of Hard Dollar payments the Plan is making to service providers; to whom those payments are made; and the services provided in exchange for those payments.

72.     In the Master Trust's filings with government regulators, Boeing disclosed that the master Trust paid more than $22 million in Hard Dollar payments to Master Trust service providers.  The Plan comprises 94% of the Master Trust, and the Plan paid its share of these expenses by deducting them from the Plan's participants' accounts.

## Revenue Sharing Payments to Plan Service Providers

73.     Revenue Sharing is a common practice in the financial, securities, and investment industry that provides services to 401(k) plans.

74.     Industry commentators and analysts consider Revenue Sharing as the "big secret of the retirement industry."

75.     Industry commentators and analysts generally define Revenue Sharing as the transfer of asset-based compensation from brokers or investment management providers (such as mutual funds, common collective trusts, insurance companies offering general insurance contracts, and similar pooled investment vehicles) to administrative service providers (record-keepers, administrators, trustees) in connection with 401(k) and other types of defined contribution plans.

76.     For example, a plan or its agent (a third-party administrator, consultant, or similar fiduciary) seeking to invest plan assets in an investment vehicle (a mutual fund, common and collective trust, guaranteed investment contract, etc. (collectively a "Fund")) will negotiate an agreement that sets the costs assessed against each dollar invested by specifying the expense ratio and available Revenue Sharing (which is included within the expense ratio).

77.     In Revenue Sharing arrangements, the plan and the Fund agree upon an asset-based fee (an expense ratio) that is not the true price for which the Fund will provide its service.

78.     Instead, the agreed asset-based fee includes *both* the actual price for which the Fund will provide its service *and* additional amounts that the Fund does not need to cover the cost of its services and to make a profit.

79.     The additional portion of the agreed-upon asset-based charge is "shared" with plan service providers or others who do business with the plan or the Fund.

80.     As a result of Revenue Sharing arrangements, plan service providers or others who do business with the plan or the Fund receive *both* a Hard Dollar payment from the plan *and* additional revenue that the Fund "shares" with them.

81.     The total fees a Fund charges to a plan can vary widely based upon a number of factors, including without limitation:  the amount that the plan invests in the Fund; the level of sophistication of the plan fiduciary negotiating the fee agreement; the plan fiduciary's awareness of  Revenue Sharing and inclination to expend effort monitoring revenue sharing transfers; the diligence with which the plan fiduciary conducts such negotiations; and the separate financial interests and/or agendas of the plan fiduciary and the Fund as they negotiate.

82.     To eliminate Hard Dollar payments altogether – and thus make a plan's fees to appear very low in disclosures to Plan participants and government regulators – a plan's fiduciaries and a Fund may agree to set a Fund's asset-based fee (its expense ratio) at a level high enough: (A) to cover the Fund's services and profit; and (B) to provide excess Revenue Sharing more than sufficient to cover all other Plan services *and more*.

83.     Revenue sharing is not confined to mutual funds.  Common collective trusts, providers of guaranteed insurance contracts, and private investment pools may enter into Revenue Sharing arrangements in connection with the services they provide to 401(k) plans.

84.     Revenue Sharing also occurs between and among brokerage firms, investment managers, fund families, and other service providers.

85.     When Plan service providers receive compensation in the form of both Hard Dollar fees *and* Revenue Sharing payments determining the total amount of fees and expenses that the Plan incurs for any category of services (*i.e.* recordkeeping and administration,

investment advisory, trustee, auditing, etc.) requires that *both* the Hard Dollar fees *and* Revenue Sharing payments be taken into account.

86.     Ascertaining whether the Plan Administrator has fulfilled its fiduciary obligation to ensure that the fees and expenses assessed against the Plan are reasonable and incurred solely in the interest of participants requires consideration whether the *total of both* the Hard Dollar *and* Revenue Sharing payments paid for any category of services complies with this standard.

87.     Although Revenue Sharing monies arise only as a result of, and in connection with, transactions involving the Plan, plan assets, the Master Trust, and service providers; Revenue Sharing is not always captured and used for the benefit of the Plan and the participants.

88.     When Revenue Sharing is foregone, the Plan or the Master Trust will not only pay additional hard dollar fees to the service providers (since no Revenue Sharing payments are used to offset those Hard Dollar costs), but it will also pay additional money to the Fund, beyond what the Fund would normally charge and keep (because the Fund's expense ratio includes Revenue Sharing amounts).

89.     Consequently, in determining whether a Plan Administrator or other fiduciary has fulfilled its obligation to ensure that the fees and expenses assessed against the Plan are reasonable and incurred solely in the interest of Plan participants, foregone Revenue Sharing must also be taken into account.

90.     Here, Defendants have caused the Plan's investment alternatives to include "A," or "Advisor" class Fund shares, which charge markedly higher expense ratio to investors than do "I" class or "institutional" shares in the same Funds.  The higher expense ratios of Advisor class shares include substantial revenue sharing availability.

91.     The Plan holds as much as half of the total shares outstanding in all share classes of these Funds.  The Plan qualifies, and should be purchasing Institutional shares with the lowest available expense ratio *and* should be receiving revenue sharing from these institutional shares or reduced fees if there is no revenue sharing.

92.     Simply stated, Defendants: (A) have negotiated, agreed to, allowed or caused excessive Fund expense ratios to be assessed against Plan participant's accounts; and (B) failed to capture, for the benefit of the Plan, Revenue Sharing amounts included within these Fund expense ratios.

93.     These excessive fees, and the forgone Revenue Sharing they include, have *not been incurred solely for the benefit of the Plan and its participants and beneficiaries as ERISA strictly and unequivocally requires.*

## Revenue Sharing Arrangements Are Not Disclosed to Plan Participants

94.     Revenue Sharing is not disclosed to plan participants and government regulators, even though it may account for a greater portion of certain categories of service provider payments than do Hard Dollar disbursements to those same providers.

95.     Accordingly, industry commentators and experts have dubbed Revenue Sharing payments to be "hidden fees" that are assessed against 401(k) plans and thus reduce plan participants' retirement savings.

96.     By entering into, allowing, and/or failing to monitor, discover, and prevent or recover these undisclosed Revenue Sharing arrangements, Defendants have and continue to deprive Plan participants of true and accurate information regarding:

    A.  How much they are paying in fees and expenses for the Plan;

    B.  Who is receiving Plan assets through Revenue Sharing;

C.   How much service providers are paid in addition to their disclosed, Hard

Dollar fees; and

D.   Whether the total amount paid to services providers (*i.e.* disclosed, hard dollar

fees *combined with* Revenue Sharing payments) is reasonable and incurred

solely for participants' benefit.

### Investment Management and Other Fees Assessed Against Employer Stock Funds

97.     Diversification is a central tenet of prudent investing.

98.     To help participants diversify their retirement savings, ERISA requires that

401(k) plans offer participants at least three investment options into which they may direct their

contributions.  The options can consist of any type of investment—stocks or bonds in U.S. based

companies, international companies, large or small companies, government securities, or

combinations of them.

99.     These investment options, to allow diversification, should carry varying degrees

of risk and anticipated return.  The VIP Stable Value Fund, for example, seeks to offer a steady,

but relatively low rate of return in exchange for a low risk of loss.  The Large Companies

International Fund, investing in companies from outside of the United States, is considered

significantly riskier, but also offers the potential of a higher rate of return.

100.    All of the Funds available to Plan participants charge fees for investment

management and other operating expenses.  These fees are subtracted from participants' Fund

balances.

101.    Investment managers are finance industry professionals who manage the assets in

a Fund.  They select the securities and other investments that the Fund buys and sells to fulfill its

objectives.

102.     The Plan pays investment management fees to investment managers for these services.  In fact, such investment management fees are the largest portion of most Funds' asset-based charges.

103.     As with other Fund fees, these investment management fees are included within the Fund's expense ratio and subtracted from participants' accounts before the returns for any particular period are reported.

104.     As a result, when a Fund reports its investment performance to participants, it does so "net" of fees and expenses and thus invisible to participants.  In any reporting period (a month, quarter, or year), a participant's balance will be based upon:  the amount of principal invested plus (or minus) an investment gains (losses) and minus the fees charged against the account.

105.     The Boeing Stock Fund is an investment option in the Plan.

106.     As the name suggests, The Boeing Company Stock Fund provides participants with the opportunity to use a portion of their retirement savings to purchase stock in the company for which they work.

107.     By its nature, The Boeing Company Stock Fund is undiversified and risky, especially when it represents a disproportionately high percentage of a participant's retirement savings.

108.     While The Boeing Company Stock Fund benefits Boeing by providing a steady market for the Company's stock and more than $3.3 billion dollars (as of 2004) in working capital from their employees' salaries, the Fund causes participants to embrace the risks inherent in undiversified investing.

109.    For the typical participant, the risk that The Boeing Company Stock Fund imposes is greater than that of other undiversified investments.

110.    The typical participant, before placing any retirement savings in The Boeing Company Stock Fund, relies on the stability and financial viability of his or her employer as the basis of maintaining a standard of living.  The employer provides the participant's salary, healthcare and other benefits, as well a pension (if any), and other retirement benefits, which all depend upon the employer's continued solvency and viability.

111.    Thus, the same risk that could impair the participant's investment in The Boeing Company Stock Fund (Boeing's failure or insolvency) would also cause the loss of current income and benefits and future non-401(k) retirement benefits.  The risks are correlated and, if realized, would financially devastate most participants.

112.    Recent, high-profile corporate scandals highlight the risks inherent in 401(k) participants' investment in Employer Stock Funds.

113.    Regardless of the risks and benefits inherent in The Boeing Company Stock Fund, from a fee and expense standpoint, it *should be* an investment option that assesses minimal, if any, fees against Plan participants' accounts.

114.    The Boeing Company Stock Fund does not need to pay for investment management, which constitutes the largest portion of most Funds' fees and expenses and thus the largest portion of Funds' expense ratios.

115.    By its very nature, The Boeing Company Stock Fund forgoes such investment management and holds an undiversified portfolio containing employer stock.  Thus, The Boeing Company Stock Fund should not assess investment management charges against participants' accounts.

116.    It is pivotal to participants' returns that such fees are not assessed against participants' savings in The Boeing Company Stock Fund or, if charged, are minimal.

117.    Further, it is crucial to participants' returns that The Boeing Company Stock Fund does not hold cash on a continuous basis.

118.    Nonetheless, The Boeing Company Stock Fund charges fees against Plan participants' accounts and holds substantial cash.

119.    Plan participants invest in The Boeing Company Stock Fund with the goal of sharing in their employer's financial success through the receipt of dividends and the increase in the value of the employer's stock.

120.    However, The Boeing Company Stock Fund's fees and expenses, and its cash holdings, undermine the extent to which participants can do so.  This is especially true when The Boeing Company Stock Fund's performance is compared to that of investors who purchase Boeing stock directly, instead of through the Plan.

121.    Participants who invest in The Boeing Company Stock Fund do not own shares of Boeing stock.  They own units of The Boeing Company Stock Fund.

122.    Each unit of The Boeing Company Stock Fund represents a portion of the shares of Boeing stock in The Boeing Company Stock Fund *and* a portion of the cash held by The Boeing Company Stock Fund.

123.    The value of each unit of The Boeing Company Stock Fund is based upon a combination of the Boeing stock value *and* the value of the cash (typically in money market investments and thus static) at any given time.

124.    As a result of the fees charged, and the cash held, in The Boeing Company Stock Fund, the return that a participant receives in The Boeing Company Stock Fund is lower than

that of a non-Plan investor – a complete stranger to the Company who invests in Boeing stock for the same period.

125.    The amount of cash that The Boeing Company Stock Fund holds reduces the extent to which participants in The Boeing Company Stock Fund share in their employers' financial success.

126.    If the value of Boeing stock is rising, or if it is paying dividends, participants who place their retirement savings in The Boeing Company Stock Fund naturally want *every* dollar they save to earn such investment gains.

127.    But the portion of the participant's savings that remains in cash, and is not used to purchase Boeing stock, does not generate such investment gains.  Instead, its value remains essentially the same.

128.    For example, if a *non-Plan investor* purchases 100 shares of Boeing stock at $100 per share, and the share value thereafter rises by 10%, he or she has reaped a $1,000 gain on the initial $10,000 investment.

129.    However, a Plan participant placing the same $10,000 in The Boeing Company Stock Fund does not receive 100 shares of Boeing stock.  He or she receives The Boeing Company Stock Fund units representing an interest in the shares of employer stock held in the Fund *and* an interest in The Boeing Company Stock Fund's cash.

130.    If The Boeing Company Stock Fund holds 3 percent cash and 97 percent stock, the 10 percent increase in the value of the employer stock will translate into a $970 gain for the participant, while the value of the cash remains static.

131.     To make matters worse, the Plan participant investing $10,000 in The Boeing Company Stock Fund will also have to pay fees and expenses.  These fees and expenses will further reduce the participant's return.

132.     While this difference may seem modest, The Boeing Company Stock Fund is the largest of all Plan investment alternatives, containing more than $3.3 billion participant dollars.

133.     Boeing has violated, and is violating, its fiduciary obligations under ERISA by: (A) charging, and or allowing to be charged, excess and unreasonable fees and expenses to participants' retirement savings in The Boeing Company Stock Fund; and (B) maintaining and holding, causing to be maintained or held, or allowing to be maintained or held, excess cash in The Boeing Company Stock Fund and thereby impairing participants' returns.

### Defendants' Non-Compliance with §404(c)'s Safe Harbor Requirements and Concealment of  Fiduciary Breaches

134.     As set forth above, the Defendants did not disclose, and to this day have not disclosed that: (A) Plan or Master Trust service providers were engaging in Revenue Sharing; (B) that Revenue Sharing was available for the benefit of the Plan and its participants and the amount of Revenue Sharing made available or paid by, or to, service providers; and (C) that the cash and fees assessed in The Boeing Company Stock Fund undermine participants' returns.

135.     Plan participants did not have, and do not have, complete and actual knowledge of the fees and expenses being charged to the Plan that reduced their account balances.

136.      Plan fiduciaries, including the Defendants, have not told Plan participants, and Plan participants do not know:

    a.     the "annual operating expenses" of the investment options in the Plan, as required by 29 C.F.R. §2550.404c-1(b)(2)(i)(B)(2)(i); and

b.      the actual expenses incurred with respect to their respective individual accounts,

as required by 29 C.F.R. §2550.404c-1(b)(2)(ii)(A).

137.    As a result of the Defendants' failure and refusal to provide such information, and the general failure on the part of the Plan fiduciaries to disclose the actual Plan and Master Trust expenses, including available Revenue Sharing, the participants have not been provided with "the opportunity to obtain sufficient information to make informed decisions with regard to investment alternatives under the [P]lan."  29 C.F.R. §2550.404c-1(b)(2)(B).

138.    Because the Defendants failed and refused to provide them with this information, and concealed this information from them, the participants have lacked the information necessary to understand and protect their interests in the Plan and to have knowledge of, and seek redress for, the Defendants' breaches of fiduciary duty.

139.    In fact, in their fiduciary rules, Defendants are the parties with the information necessary to know and understand whether the participants' rights and protections under ERISA are being, or have been, violated.

140.    ERISA fiduciaries, such as Defendants here, have an affirmative obligation to provide full and accurate information to the Plan participants regarding the administration of the Plan.

141.    A fiduciary's silence or non-disclosure in the face of such a duty to disclose is tantamount to an affirmative misrepresentation.

142.    Here, despite the Defendants' duty to disclose full and accurate information regarding the fees and expenses assessed against participants' accounts, on an ongoing basis Defendants failed and refused to disclose to, and inform the participants of:

a.  the total amount of fees and expenses reasonable and necessary to operate the Plan;

b.  the total amount of amount of fees and expenses the Plan or the Master Trust actually paid to service providers in the form of Hard Dollar payments and Revenue Sharing;

c.  the availability of Revenue Sharing;

d.  the true and accurate details regarding the revenues and expenses of the Plan;

e.  the true and accurate operating expenses that reduce participants' returns, including both Hard Dollar payments and Revenue Sharing, for each of the Plan's or the Master Trust's investment alternatives;

f.  the true and accurate transaction fees and expenses that affect the participants' account in connection with the purchase or sale of investment alternatives;

g.  the amount, when both any payments made by the Plan Sponsor combined with Hard Dollar Payments and Revenue Sharing are considered, by which the Plan's expenses exceeded those which were reasonable and incurred solely in participants' interests; and

h.  other revenue and expense information necessary for the participants to understand and protect their interests in the Plan.

143.    Based upon the foregoing, Defendants are not entitled to the safe harbor protections of ERISA § 404 (c).

144.    Based upon the foregoing, the statue of limitations was tolled on the breaches set forth in this Complaint and did not begin to run until such time as Plaintiffs actually discovered them.

<u>**COUNT I:**</u>
**[Breach of Fiduciary Duty – ERISA §502(a)(2)]**

145.    Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 144 as though fully set forth here.

146.    As set forth in detail above, Defendants owe to the Plan, its participants and beneficiaries, and the Class extensive fiduciary duties including, without limitation:

A.  To conduct themselves as Plan Sponsor and Administrator with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent ERISA professional fiduciary would in operating and administering a 401(k) plan the size and character of the Plan;

B.  To perform their duties as Plan Sponsor and Administrator with the utmost loyalty and fidelity to the Plan and its participants and beneficiaries, avoiding at all times conflicts of interest, self-interest, and duplicity;

C.  To ensure, at all times, that Plan assets "shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan;"

D.  To track and account for all transactions involving the Plan and Plan assets so as to ensure that Plan assets are retained, managed, and disbursed in compliance with the Plan Document and ERISA;

E.  To track and account for all transactions involving the Plan and Plan assets so as to ensure that Plan assets "never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in

the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan;"

F.   To ensure that the fees and expenses incurred by the Plan are reasonable and incurred for the sole and exclusive benefit of Plan participants and beneficiaries;

G.   In entering into agreements with service providers to the Plan, to ensure that the payments from the Plan or Master Trust, whether they are direct or indirect, are reasonable for the services provided and made for the sole and exclusive benefit of Plan participants and beneficiaries;

H.   In operating and administering the Plan, to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plan were reasonable and incurred solely for the benefit of Plan participants;

I.   In operating and administering the Plan, on an ongoing basis to monitor the payments made by the Plan to service providers, whether they are direct or indirect, are and remain reasonable for the services provided and made for the sole and exclusive benefit of Plan participants and beneficiaries;

J.   To inform itself of, and understand, the various methods by which vendors in the 401(k) industry collect payments and other revenues from 401(k) plans;

K.   To inform itself of trends, developments, practices, and policies in the retirement, financial investment and securities industry which affect the Plan; and to remain aware and knowledgeable of such trends, practices and policies on an ongoing basis;

L.  To communicate with Plan participants and beneficiaries regarding the Plan honestly, clearly, completely, and accurately;

M.  To affirmatively and without request provide Plan participants and beneficiaries with honest, accurate, and complete information they need to understand their investments in the Plan, the management, risk, potential returns of such investments, and the fees and expenses incurred in connection with those investments;

N.  Upon request, to provide information to Plan participants and beneficiaries regarding the operation and administration of the Plan and the expenses incurred in doing so; and

O.  To provide honest, accurate and complete information to Plan participants and beneficiaries regarding the costs associated with their various investment choices and directions.

147.     As set forth in detail above, Defendants breached their fiduciary obligations to the Plan, Plan participants and beneficiaries and the Class by, among other conduct to be proven at trial:

A.  Causing the Plan to enter into agreements with service providers under which the Plan paid, directly or indirectly, completely or in-part, fees and expenses that were unreasonable and not incurred solely for the benefit of Plan participants and beneficiaries;

B.  Allowing the Plan to pay, directly on indirectly, fees and expenses that were unreasonable and not incurred solely for the benefit of Plan participants and beneficiaries;

C.   Failing to monitor the fees and expenses paid by the Plan and, by such failure, causing, or allowing the Plan to pay fees and expenses that were unreasonable and not incurred solely for the benefit of Plan participants and beneficiaries;

D.   Failing to inform itself of trends, developments, practices, and policies in the retirement, financial investment, and securities industry that affect the Plan; and failing to remain aware and knowledgeable of such trends, practices, and policies on an ongoing basis;

E.   Failing to inform itself of, and understand, the various methods by which vendors in the 401(k) industry collect payments and other revenues from 401(k) plans;

F.   Failing to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plan were reasonable and incurred solely for the benefit of Plan participants;

G.   Failing to communicate with Plan participants and beneficiaries regarding the Plan honestly, clearly, and accurately;

H.   Failing properly to inform or disclose to Plan participants the fees and expenses that are, or have been, paid by the Plan;

I.    Failing to inform or disclose to Plan participants in proper detail and clarity the transactions, fees and expenses that affect participants' accounts balances in connection with the purchase or sale of interests in investment alternatives;

J.    Failing to discover, disclose and stop the charging of  hidden and excessive fees to the Plan; and

K.  By the foregoing conduct, failing to exercise the care, skill, prudence and diligence that a prudent person would when acting in like capacity and familiar with such matters.

148.     As set forth in detail above, as a result of these breaches, Plaintiffs, the Class, the Plan, and the Plan's participants and beneficiaries have suffered financial losses and damages.

149.     Further, as set forth in detail above, Defendants failed to provide participants and beneficiaries with sufficient investment information to qualify for the Safe Harbor immunity of ERISA § 404(c), 29 U.S.C. 1104(c).  Accordingly, Defendants are liable for participants and beneficiaries' investment losses in the Plan.

150.     Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a)(2), Defendants are liable to restore to the Plan the losses it experienced as a direct result of Defendants' breaches of fiduciary duty, the profits it made from using Plan assets for its benefit, and are liable for any other available and appropriate equitable relief, including prospective injunctive relief and declaratory relief, and attorney's fees.

## COUNT II:
### [Other Remedies for Breach of Fiduciary Duty – ERISA §502(a)(3)]

151.     Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 149 as though fully set forth here.

152.     In addition to, and as an alternative to, the causes of action stated in Count I, Plaintiffs seek further relief pursuant to  ERISA § 502(a)(3), 29 U.S.C., § 1132(a)(3).

153.     Under ERISA §502(a)(3), a participant may enjoin any act which violates ERISA or may obtain other appropriate equitable relief to redress such violations or enforce the terms of ERISA.

154.     Defendants are the primary fiduciaries of the Plan and occupy a position of trust and confidence in connection with the Plan, the Plan's assets, and the Plan's participants and beneficiaries.

155.     Defendants have exclusive discretion and control over the Plan's assets and are strictly obligated to exercise that control "for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan."

156.     Although *only* Plan participants and beneficiaries are entitled to Plan assets and to the benefit of Plan assets, in the absence of full and candid disclosure from Defendants, Plan participants and beneficiaries do not know, and have no means of knowing, how their assets have been managed and disbursed.

157.     Accordingly, Defendants occupy the position of a common law trustee in connection with the Plan, its assets, and its participants and beneficiaries.

158.     As set forth in detail above, Defendants have caused and/or allowed the plan to pay, directly or indirectly, excess fees and expenses to Plan service providers and to Boeing itself.

159.     Defendants, and not the Plaintiffs, are the entities that have or should have specific and detailed information regarding how Plan assets have been treated and disbursed in this regard.

160.     Accordingly, the Court should order that Defendants render an accounting of all transactions, disbursements and dispositions occurring in, in connection with, or in respect of, the Plan and its assets.

161.     Plaintiffs respectfully request that the Court order that such an accounting include, without limitation, detailed and specific information regarding all fees and expenses incurred by the Plan or paid to third parties, whether paid directly by the Plan Sponsor (in part), the Plan, or the Master Trust or indirectly transferred among Plan service providers or other third parties, and the profit paid to Boeing or its subsidiaries from participants accounts.

162.     Plaintiffs respectfully request that the Court surcharge against the Defendants and in favor of the Plan all amounts involved in transactions which such accounting reveals were or are improper, excessive or in violation of ERISA.

163.     Plaintiffs further seek injunctive and other appropriate equitable relief to redress the wrongs described above and to cause them to cease in order for the Plan's participants and beneficiaries to receive the full benefit of their retirement savings in the future.

WHEREFORE Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- find and  declare that the Defendants have breached their fiduciary duties as described above;

- order the Defendants to make good to the Plan all losses that the Plan incurred as a result of the conduct described above and to restore the Plan to the position it would have been in but for the breaches of fiduciary duty;

- impose a constructive trust on any monies by which the Defendants were unjustly enriched as a result of their breaches of fiduciary duty and cause the Defendants to disgorge such monies and return them to the Plan;

- remove the fiduciaries who have breached their fiduciary duties or enjoin them from future breaches of ERISA;

- award actual damages to the Plan in the amount of its monetary losses;

- require Defendants to render an accounting as set forth above;

- surcharge against Defendants and in favor of the Plan all amounts involved in transaction which such accounting reveals were or are improper, excessive, or in violation of ERISA;

- permanently enjoin Defendants from breaching their fiduciary duties in each respect set forth in the Complaint;

- award to the Plaintiffs and the Class their attorneys fees and costs pursuant to ERISA § 502(g);

- order costs and attorneys fees pursuant to ERISA § 502(g) and the common fund doctrine;

- order equitable restitution or other available equitable relief against the Defendants;

- order the payment of interest to the extent it is allowed by law; and

- grant any other and further relief the Court deems appropriate.

Respectfully Submitted,

SCHLICHTER, BOGARD & DENTON


By:  /s/ Jerome J. Schlichter
     Jerome J. Schlichter, 32225
     Daniel V. Conlisk, 36544
     100 S. Fourth St., Suite 900
     St. Louis, Missouri 63102
     And
     120 W. Main Street, Ste 208
     Belleville, IL 62220
     (314) 621-6115
     (314) 621-7151 (Fax)
     dconlisk@uselaws.com


     ATTORNEYS FOR PLAINTIFFS/
     CLASS REPRESENTATIVES
     Gary Spano, John Bunk, James
     White, Jr. and Victor Dubbs