## UNITED STATES DISTRICT COURT DISTRICT
## SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Gary Spano, John Bunk, and James White, Jr. as representatives of a class of similarly situated persons, and on behalf of the Plan, | ) ) ) ) ) | |
| Plaintiffs; | ) ) | Cause No: 06-743-JLF |
| v. | ) ) | |
| The Boeing Company, Employee Benefits Plans Committee, Scott M. Buchanan, <u>and Employee Benefits Investment Committee,</u> | ) ) ) ) ) ) | |
| Defendants. | ) | |

## <u>AMENDED COMPLAINT FOR BREACH OF FIDUCIARY DUTY</u>

### INTRODUCTION

1.      Personal savings accounts, such as 401(k)s, are quickly becoming employees' primary method of financially planning for retirement.  An increasing number of companies recently have announced the termination of traditional defined benefit pension plans and their replacement by defined contribution 401(k) plans.  For many employees in the United States today, an employer-provided defined benefit pension awaiting their retirement is a quaint, historical notion.

2.      In 401(k) plans, employers provide an opportunity for employees to save their own pre-tax dollars in individual 401(k) accounts.  The accounts provide a number of investment alternatives into which employees place a portion of their current income with the hope of earning, over time, a return sufficient to support themselves and their families in retirement.

3.      Accordingly, in 401(k) plans, the return on employees' investments is critical. Even seemingly small reductions in a participant's return in one year may substantially impair his or her accumulated savings at retirement.

4.      While such reductions in 401(k) accounts' returns may result from market fluctuations, a consistent, albeit rarely discussed, force reducing 401(k) accounts' earnings is the administrative fees and expenses assessed against account balances.

5.      The most certain means of increasing the return on employees' 401(k) savings is to reduce the fees and expenses employees pay from their 401(k) accounts.

6.      Unlike generalized market fluctuations, employers can control these fees and expenses.  Federal law requires them to do so.

7.      Under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001 *et seq.* ("ERISA"), an employer who provides a 401(k) plan for its employees is a "Plan Sponsor." The employer or its agent may also serve as "Plan Administrator," or the employer may appoint a third party to serve as such.  Both the Plan Sponsor and the Plan Administrator are fiduciaries of the 401(k) plan.  The Plan Administrator performs or contracts for administrative, record-keeping, investment management, and other services from entities in the financial and retirement industry.  ERISA requires that the fees for these services must be reasonable, incurred solely for the benefit of Plan participants, and fully disclosed.

8.      For providing various services, third-party plan administrators, record-keepers, consultants, investment managers, and other vendors in the 401(k) industry have developed a variety of pricing and fee structures.

9.      At best, these fee structures are complicated and confusing when disclosed to Plan participants.  At worst, they are excessive, undisclosed, and illegal.

10.     In this action, pursuant to ERISA §502(a), 29 U.S.C. §1132(a), Plaintiffs and Class Representatives Gary Spano, John Bunk, and James White, Jr. on behalf of The Boeing Company Voluntary Investment Plan (the "Plan") and similarly situated participants and beneficiaries in the Plan, seek to recover the losses suffered by the Plan and to obtain injunctive and other equitable relief for the Plan from The Boeing Company ("Boeing"), the Plan Sponsor, the Employee Benefit Plans Committee (the "Committee"), the Plan Administrator, the Employee Benefits Investment Committee, and other defendants identified below based upon breaches of their fiduciary duties (collectively "Defendants").

11.     As set forth in detail below, the fees and expenses paid by the Plan, and thus borne by Plan participants, were and are unreasonable and excessive; not incurred solely for the benefit of the Plan and its participants; and undisclosed to participants.  By subjecting the Plan and its participants to these excessive fees and expenses, and by other conduct set forth below, Defendants violated their fiduciary obligations under ERISA.

## PARTIES, JURISIDCTION AND VENUE

### Plaintiffs:

12.     Plaintiff and Class Representative Gary Spano is a resident of Godfrey, Illinois, and this District.

13.     Plaintiff and Class Representative John Bunk is a resident of Shipman, Illinois.

14.     Plaintiff and Class Representative James White, Jr. is a resident of St. Peters, Missouri.

15.     Each Plaintiff and Class Representative is a participant in the Plan.

**Defendants:**

16.     Defendant The Boeing Company has its headquarters in Chicago, Illinois and employs approximately 153,800 employees in 48 states and 67 countries.  Boeing's major operations are in the Puget Sound area of Washington State, Southern California, and St. Louis, Missouri. Total revenues for Boeing in 2005 were $54.8 billion.

17.     According to its website, Boeing is organized into three business units: Boeing Commercial Airplanes, Boeing Integrated Defense Systems, and Boeing Capital Corporation. Supporting these units is the Shared Services Group, which provides a broad range of services to Boeing Worldwide, and Boeing Engineering, Operations & Technology, which helps develop, acquire, apply, and protect innovative technologies and processes.

18.     Boeing is Plan Sponsor pursuant to ERISA §3(16) and the Plan document.

19.     Defendant Employee Benefit Plans Committee (the "Committee") is the Plan Administrator pursuant to ERISA §3(16) and the Plan document.  The Committee is comprised of Boeing officers and employees.  Committee members serve at the appointment and discretion of Boeing's Board of Directors.

20.     Defendant Employee Benefits Investment Committee (the "EBIC") is a fiduciary of the Plan and all of the assets of all Boeing employee benefit plans.  The Boeing Board of Directors has appointed the EBIC as a Plan fiduciary.  The Boeing Board of Directors has delegated to the EBIC authority to invest, reinvest and manage assets of all Boeing employee benefit plans and to select and monitor the investment options for the Plan.  The Boeing Board of Directors has authorized the EBIC to select, hire, retain, appoint, replace and/or terminate plan trustees investment managers mutual funds vendors and advisers.

21.     Defendant Scott M. Buchanan is Boeing's Director of Benefits Delivery and the individual designated by Boeing to sign as Plan Administrator of the Plan for filings with government regulators.

## Jurisdiction and Venue:

22.     Plaintiffs bring this action pursuant to ERISA §§502(a)(2), (3), 29 U.S.C. §§1132(a)(2), (3), which provides that participants may pursue civil actions on behalf of the Plan to remedy breaches of fiduciary duty as set forth in ERISA §409, 29 U.S.C. §1109, and to obtain other appropriate equitable relief.  This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. §1331 and 29 U.S.C. §1132(e)(1)(2).

23.     All Defendants are subject to service of process issued from this Court pursuant to 29 U.S.C. §1132(e)(1).

24.     Venue is proper in this Court pursuant to 29 U.S.C. §1132 (e)(2) because breaches of fiduciary duty giving rise to this action occurred in this district and this division of the district in that Plaintiff and Class representative Gary Spano resides in this district, participated in the Plan from this district, received statements, Plan summaries, and other information from the Defendants in this district and suffered damages in this district.

## Rule 23 Requires Class Certification:

25.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and all similarly situated Plan participants and beneficiaries. They seek to represent the following class (the "Class"):

> All persons, *excluding the Defendants, and other individuals who are or may be liable for the conduct described in this Complaint,* who are or were participants or beneficiaries of the Plan and who are, were, or may have been affected by the conduct set forth in this Complaint, as well as those who will become participants or beneficiaries of the Plan in the future.

26.     Certification of this Class is proper under Rule 23(a) in that:

A. **Numerosity.**  The members of the Class are so numerous that joinder of all members is impracticable.  Although the Plaintiffs do not know the exact number of Class members as of the date of filing, the Plan's public documents state that, at the end of the 2004 Plan year, there were 189,577 participants with account balances in the Plan.

B. **Commonality.** Common issues of fact and law predominate over any issues unique to individual Class members.  Issues that are common to all Class members include, but are not limited to, whether the Defendants:

i.  <u>Included investment options in the Plan which were imprudent and improper in light of the Plan's size and negotiating leverage;</u>

ii.  <u>Included investment options that caused participants' retirement savings to consistently under-perform the market in long-term retirement savings;</u>

iii.  Charged fees and expenses to the Plan that were, or are, unreasonable or not incurred solely for the benefit of Plan participants;

iv.  Caused the Plan to enter into agreements with third-parties that caused or allowed the Plan to pay fees and expenses that were, or are, unreasonable or not incurred solely for the benefit of Plan participants;

v.  Failed to monitor the fees and expenses paid by the Plan and, by such failure, caused or allowed the Plan to pay fees and expenses

that were, or are, unreasonable or not incurred solely for the benefit of Plan participants;

vi.   Failed to inform themselves of, and understand, the various methods by which vendors in the 401(k), financial and retirement industry collect payments and other revenues from 401(k) plans;

vii.   Failed to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plan were reasonable and incurred solely for the benefit of Plan participants;

viii.   Failed properly to inform, or disclose to, Plan participants the fees and expenses that are, or have been, paid by the Plan;

ix.   Failed to inform, or disclose to, Plan participants in proper detail and clarity the transaction fees and expenses that affect participants' accounts balances in connection with the purchase or sale of interests in investment alternatives;

x.   Breached their fiduciary duties by failing to disclose that hidden and excessive fees were and are being assessed against Plan assets and by failing to stop such hidden excessive fees;

xi.    In charging, causing to be charged or paid, and failing to monitor the fees and expenses of the Plan, failed to exercise the care, skill, prudence, and diligence that a prudent person would when acting in like capacity and familiar with such matters;

      xii.  Caused or allowed fees and expenses to be paid by the Plan for purposes other than those allowed by ERISA;

      xiii.  By the conduct above and by other conduct set forth in this Complaint, revealed in discovery or proven at trial, breached their fiduciary and other ERISA-imposed obligations to the Plan, Plan participants, and members of the Class;

      xiv.  Are liable to the Plan and the Class for losses suffered as a result of the breaches of their breached their fiduciary and other ERISA-imposed obligations; and

      xv.  Are responsible to account for the assets and transactions of the Plan and should be charged/surcharged for any transactions and payments for which they cannot account.

C. **Typicality.**  The claims brought by the Plaintiffs are typical of those of the absent Class members, in that:

      i.  The Defendants owed the exact same fiduciary and other ERISA-based obligations to each Plan participant and beneficiary, and each member of the Class;

      ii.  The Defendants' breach of those obligations constitutes a breach to each participant and beneficiary, and each member of the Class;

      iii.  To the extent that there are any differences in Class members' damages, such differences would be a product of simple mathematics based upon account balances in the Plan.  Such

minimal and formulaic differences are no impediment to class certification.

D. **Adequacy of Representation.**  The Plaintiffs are adequate representatives of the absent Class members and will protect such absent Class members' interests in this litigation.  The Plaintiffs do not have any interests antagonistic to the other Class members and they do not have any unique claims or defenses that might undermine the efficient resolution of the Class' claims. Plaintiffs have retained competent counsel, versed in ERISA, class actions, and complex litigation.

27. Class certification is also appropriate under Rule 23(b) and each subpart in that:

A. Pursuant to Rule 23(b)(1)(A), in the absence of certification, there is a risk of inconsistent adjudications with respect to individual class members;

B. Pursuant to Rule 23(b)(2), as set forth above, the Defendants have acted on grounds generally applicable to the Class as a whole; and

C. Pursuant to Rule 23(b)(3), as set forth above, common issues of law and fact predominate over any purely individual issues and thus a class action is superior to any other method for adjudicating these claims.

## FACTS APPLICABLE TO ALL COUNTS

### The Plan

28. As part of their compensation and benefits, Boeing offers certain of its employees the opportunity to participate in the Plan.  The Plan is a "defined contribution plan," as defined in ERISA §3(34), 29 U.S.C. §1002(34), and contains or is part of an "eligible individual account

plan" under ERISA §407(d)(3)(A), 29 U.S.C. §1107(d)(3)(A).  It is also a tax-qualified plan of the type popularly known as a "401(k) plan."

29.    Boeing benefits by providing the Plan to eligible employees in that the opportunity to participate enhances Boeing's ability to recruit and retain qualified personnel, fosters employee loyalty and goodwill, and entitles Boeing to tax advantages under the Internal Revenue Code.

30.    Boeing has designed the Plan, combined with the certain other Boeing defined contribution plans, to be administered through a master trust pursuant to the Master Trust Agreement Between The Boeing Company and State Street Bank and Trust Company as of October 1, 1997 as thereafter amended (the "Master Trust").

31.    A master trust is a separate trust entity established by an employer or group of related employers to provide investment and administrative services to a 401(k) plan or plans. Plan sponsors and administrators generally utilize master trusts to administer multiple 401(k) plans for an employer or related-employer group (*e.g.* a company or related companies that maintain salaried and hourly employee plans; plans formerly sponsored or administered by a company that the employer has acquired or with whom the employer has merged; plans which include only employees of a bargaining unit or represented by a labor organization, etc.).

32.    Through a master trust structure, several 401(k) plans may invest in common investment options or funds offered in the master trust and may share the services of master trust record-keepers, investment managers, consultants, and other service providers.  The fees incurred for such services typically are allocated among participating plans based upon each plan's proportionate share of the assets in the master trust.

33.     The Plan's assets comprise approximately 94 percent of the assets in the Master Trust.

34.     According to the Master Trust's audited financial statements filed with federal regulators:

> The Boeing Company (the "Company") Employee Savings Plans Master Trust (the "Master Trust"), facilitates the commingling of employee benefit plan assets for investment and administrative purposes.  Eligible participants are defined by the plans as Members. . . . State Street Bank and Trust Company ("SSBT") serves as the trustee for the Master Trust.
>
> * * *
>
> Each Plan participating in the Master Trust has an interest in the net assets of one or more Master Trust investment funds and the changes therein.  The assets are invested and managed jointly and then allocated between six Plans.  The allocation of net assets available for benefits is based on the respective number of units held by the Plans' Members as of plan year-end.  The allocation of the changes in net assets available for benefits is calculated daily based on the units held by the Plans' Members as of that day's end.

35.     According to the Plan's audited financial statements filed with federal regulators:

> **Expenses**—Necessary and proper expenses of the Plan are paid from the Plan assets at the Master Trust level except for those expenses the Company is required by law or chooses to pay.

36.     According to the SPD, participants may choose to invest in any of the 19 investment options available under the Plan:

**Investment Funds**

- Lifecycle Retirement Fund
- Lifecycle 2010 Fund
- Lifecycle 2020 Fund
- Lifecycle 2030 Fund
- Lifecycle 2040 Fund

- Bond Market Index Fund
- Balanced Index Fund
- S&P 500 Index Fund
- Russell 2000 Index Fund
- International Index Fund

- VIP Stable Value Fund

- Large Companies Value Fund

- Large Companies Core Fund

- Large Companies International Fund

- Small/Mid Companies Value Fund

- Small/Mid Companies Growth Fund

- Science and Technologies Fund

- Boeing Stock Fund

37.     According to the SPD, the Boeing Stock Fund:

> invests its assets almost entirely in common stock of The Boeing Company. The fund also holds a small amount in cash or cash equivalents to reduce the need to sell Boeing stock for fund redemptions. The cash position is targeted to be in the 1 to 2 percent range; however, it may fall outside of that range due to participant activity.

38.     Boeing indemnifies the Committee, the EBIC and individual employees, officers, and members to the fullest extent provided in the by-laws of The Boeing Company.

### Defendants' Fiduciary Duties

39.     Defendants are bound by ERISA's imposition of a fiduciary duty that has been characterized as "the highest known to law." Defendants' fiduciary obligations require that, at all times, they conduct themselves with the utmost good faith, loyalty and fidelity; act with the sole purpose of advancing the interests of the Plan, its participants, and beneficiaries; scrupulously avoid all self-interest, duplicity, and deceit; and fully disclose to and inform participants and beneficiaries of all material information.

40.     Defendants' fiduciary obligations under ERISA require that they exercise the care, skill, and diligence which a prudent expert would in the operation of a Plan with like character and aims.

41.     Defendants' fiduciary obligations under ERISA require that they discharge their duties with the exclusive purpose of providing benefits to Plan participants and beneficiaries and defraying the reasonable cost of administering the Plan.

42.     Defendants' fiduciary obligations under ERISA require that they ensure, at all times, that Plan assets are *never* used for the benefit of the employer; here, Boeing.

43.     Defendants' fiduciary obligations under ERISA require them to scrupulously avoid any transaction in which Plan assets would be used by, or inure to the benefit of, a party-in-interest in connection with the Plan.

## The Fees and Expenses Assessed Against The Plan

44.     Either directly or through the Master Trust, Defendants have caused the Plan to purchase trustee, record-keeping, administration, investment management, brokerage, consulting, auditing, and other services from various institutions and entities.  These fees are, and have been, unreasonable and excessive; especially in light of the Plan's enormous size and asset value.

45.     Either directly or through the Master Trust, Defendants have caused the amounts that the Plan pays for these services to be assessed against Plan participants' accounts.

46.     Either directly or through the Master Trust, Defendants have caused or allowed these services providers to receive payment in at least one of two ways:

A.  By direct disbursement from the Plan or the Master Trust to the entity providing the service; or

B.  By receiving, or having the opportunity to receive, "Revenue Sharing" payments comprised of Plan assets distributed between or among various service providers.

### "Hard Dollar" Payments to Plan Service Providers

47.     Payments in the form of direct disbursements from the Plan or the Master Trust to participants or an entity providing a service to the Plan or the Master Trust are characterized as "Hard Dollar" payments.

48.     Plan Sponsors, like Defendants, generally discloses to government regulators and Plan participants, in one form or another, Hard Dollar payments made from the Plan to service providers.

49.     When such disclosures are made, understanding the Plan's service provider expenses for a given year *appears* straightforward:  the Plan transfers funds in a stated amount to the provider in return for the provider's services.  From this, Plan participants and government regulators surmise that the Plan expended the stated amount in exchange for the services.

50.     In 2004, Boeing disclosed no Hard Dollar payments from the Plan to Plan service providers.  Obviously, the Plan contracted for services and paid service providers for them.

### "Hard Dollar' Expenses and Master Trusts

51.     Because Boeing's administers the Plan through a Master Trust, the disclosure of Hard Dollar payments for services provided to the Plan is unclear, and may be incomplete and inaccurate.

52.     These shortcomings arise because the Hard Dollar payments to *Plan* service providers are made *from the Master Trust* and reported to government regulators *only in connection with the Master Trust.*

53.     The *Plan's* disclosures to government regulators and participants do not include the Hard Dollar payments made to service providers *from the Master Trust*.  Those payments to service providers – because they are disbursed *from the Master Trust*– are reported in its

disclosures to government regulators.  Details of such payments from the Master Trust are not routinely disclosed to Plan participants.

54.     As a result, it may appear to participants and government regulators that Hard Dollar payments made by the Plan to service providers in a given year were very small, or that the Plan did not incur such expenses at all.

55.     But, in actuality, substantial Hard Dollar payments *to plan service providers* may have been disbursed *from the Master Trust* and then allocated to the Plan.

56.     Even though such Hard Dollar payments are disbursed from the Master Trust, the Plan and its participants still pay them:  The Master Trust assesses the amount of these Hard Dollar payments against the Plan's assets held in the Master Trust.

57.     When Hard Dollar payments for Plan services are disbursed from the Master Trust, it becomes difficult, and sometimes impossible, for Plan participants to discern the amount of Hard Dollar payments the Plan is making to service providers; to whom those payments are made; and the services provided in exchange for those payments.

58.     In the Master Trust's filings with government regulators, Boeing disclosed that the Master Trust paid more than $22 million in Hard Dollar payments to Master Trust service providers.  The Plan comprises 94% of the Master Trust, and the Plan paid its share of these expenses by deducting them from the Plan's participants' accounts.

**Revenue Sharing Payments to Plan Service Providers**

59.     Revenue Sharing is a common practice in the financial, securities, and investment industry that provides services to 401(k) plans.

60.     Industry commentators and analysts consider Revenue Sharing as the "big secret of the retirement industry."

61.     Industry commentators and analysts generally define Revenue Sharing as the transfer of asset-based compensation from brokers or investment management providers (such as mutual funds, common collective trusts, insurance companies offering general insurance contracts, and similar pooled investment vehicles) to administrative service providers (record-keepers, administrators, trustees) in connection with 401(k) and other types of defined contribution plans.

62.     For example, a plan or its agent (a third-party administrator, consultant, or similar fiduciary) seeking to invest plan assets in an investment vehicle (a mutual fund, common and collective trust, guaranteed investment contract, etc. (collectively a "Fund")) will negotiate an agreement that sets the costs assessed against each dollar invested by specifying the expense ratio and available Revenue Sharing (which is included within the expense ratio).

63.     In Revenue Sharing arrangements, the plan and the Fund agree upon an asset-based fee (an expense ratio) that is not the true price for which the Fund will provide its service.

64.     Instead, the agreed asset-based fee includes ***both*** the actual price for which the Fund will provide its service ***and*** additional amounts that the Fund does not need to cover the cost of its services and to make a profit.

65.     The additional portion of the agreed-upon asset-based charge is "shared" with plan service providers or others who do business with the plan or the Fund.

66.     As a result of Revenue Sharing arrangements, plan service providers or others who do business with the plan or the Fund receive *both* a Hard Dollar payment from the plan *and* additional revenue that the Fund "shares" with them.

67.     The total fees a Fund charges to a plan can vary widely based upon a number of factors, including without limitation:  the amount that the plan invests in the Fund; the level of sophistication of the plan fiduciary negotiating the fee agreement; the plan fiduciary's awareness of Revenue Sharing and inclination to expend effort monitoring revenue sharing transfers; the diligence with which the plan fiduciary conducts such negotiations; and the separate financial interests and/or agendas of the plan fiduciary and the Fund as they negotiate.

68.     To eliminate Hard Dollar payments altogether – and thus make a plan's fees to appear very low in disclosures to Plan participants and government regulators – a plan's fiduciaries and a Fund may agree to set a Fund's asset-based fee (its expense ratio) at a level high enough: (A) to cover the Fund's services and profit; and (B) to provide excess Revenue Sharing more than sufficient to cover all other Plan services *and more*.

69.     Revenue sharing is not confined to mutual funds.  Common collective trusts, providers of guaranteed insurance contracts, and private investment pools may enter into Revenue Sharing arrangements in connection with the services they provide to 401(k) plans.

70.     Revenue Sharing also occurs between and among brokerage firms, investment managers, fund families, and other service providers.

71.     When Plan service providers receive compensation in the form of both Hard Dollar fees *and* Revenue Sharing payments determining the total amount of fees and expenses that the Plan incurs for any category of services (*i.e.* recordkeeping and administration,

investment advisory, trustee, auditing, etc.) requires that *both* the Hard Dollar fees *and* Revenue Sharing payments be taken into account.

72.     Ascertaining whether the Plan Administrator has fulfilled its fiduciary obligation to ensure that the fees and expenses assessed against the Plan are reasonable and incurred solely in the interest of participants requires consideration whether the *total of both* the Hard Dollar *and* Revenue Sharing payments paid for any category of services complies with this standard.

73.     Although Revenue Sharing monies arise only as a result of, and in connection with, transactions involving the Plan, plan assets, the Master Trust, and service providers; Revenue Sharing is not always captured and used for the benefit of the Plan and the participants.

74.     When Revenue Sharing is foregone, the Plan or the Master Trust will not only pay additional hard dollar fees to the service providers (since no Revenue Sharing payments are used to offset those Hard Dollar costs), but it will also pay additional money to the Fund, beyond what the Fund would normally charge and keep (because the Fund's expense ratio includes Revenue Sharing amounts).

75.     Consequently, in determining whether a Plan Administrator or other fiduciary has fulfilled its obligation to ensure that the fees and expenses assessed against the Plan are reasonable and incurred solely in the interest of Plan participants, foregone Revenue Sharing must also be taken into account.

76.     Here, Defendants have caused the Plan's investment options to charge undisclosed Revenue Sharing allocations against the Plan, and thus participants' retirement savings.  For example, Defendants have caused the Plan's investment alternatives to include "A," or "Advisor" class Fund shares, which charge markedly higher expense ratio to investors than do

"I" class or "institutional" shares in the same Funds.  The higher expense ratios of Advisor class shares include substantial revenue sharing availability.

77.     The Plan holds as much as half of the total shares outstanding in all share classes of these Funds.  The Plan qualifies, <u>because of its enormous size, for separate accounts with lower fees and that provide market returns as opposed to higher-priced mutual funds.  But if Defendants were to include mutual funds as Plan investment options, the Plan should only include</u> institutional shares with the lowest available expense ratio *and* should be receiving revenue sharing from these institutional shares or reduced fees if there is no revenue sharing.

78.     Simply stated, Defendants: (A) have negotiated, agreed to, allowed or caused excessive Fund expense ratios to be assessed against Plan participant's accounts; and (B) failed to capture, for the benefit of the Plan, Revenue Sharing amounts included within these Fund expense ratios.  <u>This has caused the Plan to pay excessive fees for investment management, recordkeeping, administration, trading and brokerage costs, and other fees and expenses incurred in the operation of the Plan.</u>

79.     These excessive fees, and the forgone Revenue Sharing they include, have *not been incurred solely for the benefit of the Plan and its participants and beneficiaries as ERISA strictly and unequivocally requires.*  <u>By subjecting the Plan to such excessive fees and by selecting investment options that assessed excessive fees against participants' accounts to provide soft dollars for Revenue Sharing programs, Defendants breached their fiduciary duties.</u>

<u>**Investment Management and Other Fees Assessed Against**</u>
<u>**Employer Stock Funds**</u>

80.     Diversification is a central tenet of prudent investing.

81.     To help participants diversify their retirement savings, ERISA requires that 401(k) plans offer participants at least three investment options into which they may direct their

contributions.  The options can consist of any type of investment—stocks or bonds in U.S. based companies, international companies, large or small companies, government securities, or combinations of them.

82.     These investment options, to allow diversification, should carry varying degrees of risk and anticipated return.  The VIP Stable Value Fund, for example, seeks to offer a steady, but relatively low rate of return in exchange for a low risk of loss.  The Large Companies International Fund, investing in companies from outside of the United States, is considered significantly riskier, but also offers the potential of a higher rate of return.

83.     All of the Funds available to Plan participants charge fees for investment management and other operating expenses.  These fees are subtracted from participants' Fund balances.

84.     Investment managers are finance industry professionals who manage the assets in a Fund.  They select the securities and other investments that the Fund buys and sells to fulfill its objectives.

85.     The Plan pays investment management fees to investment managers for these services.  In fact, such investment management fees are the largest portion of most Funds' asset-based charges.

86.     As with other Fund fees, these investment management fees are included within the Fund's expense ratio and subtracted from participants' accounts before the returns for any particular period are reported.

87.     As a result, when a Fund reports its investment performance to participants, it does so "net" of fees and expenses and thus invisible to participants.  In any reporting period (a month, quarter, or year), a participant's balance will be based upon:  the amount of principal

invested plus (or minus) an investment gains (losses) and minus the fees charged against the account.

88.    The Boeing Stock Fund is an investment option in the Plan.

89.    As the name suggests, The Boeing Company Stock Fund provides participants with the opportunity to use a portion of their retirement savings to purchase stock in the company for which they work.

90.    By its nature, The Boeing Company Stock Fund is undiversified and risky, especially when it represents a disproportionately high percentage of a participant's retirement savings.

91.    While The Boeing Company Stock Fund benefits Boeing by providing a steady market for the Company's stock and more than $3.3 billion dollars (as of 2004) in working capital from their employees' salaries, the Fund causes participants to embrace the risks inherent in undiversified investing.

92.    For the typical participant, the risk that The Boeing Company Stock Fund imposes is greater than that of other undiversified investments.

93.    The typical participant, before placing any retirement savings in The Boeing Company Stock Fund, relies on the stability and financial viability of his or her employer as the basis of maintaining a standard of living.  The employer provides the participant's salary, healthcare and other benefits, as well a pension (if any), and other retirement benefits, which all depend upon the employer's continued solvency and viability.

94.    Thus, the same risk that could impair the participant's investment in The Boeing Company Stock Fund (Boeing's failure or insolvency) would also cause the loss of current

income and benefits and future non-401(k) retirement benefits.  The risks are correlated and, if realized, would financially devastate most participants.

95.     Recent, high-profile corporate scandals highlight the risks inherent in 401(k) participants' investment in Employer Stock Funds.

96.     Regardless of the risks and benefits inherent in The Boeing Company Stock Fund, from a fee and expense standpoint, it *should be* an investment option that assesses minimal, if any, fees against Plan participants' accounts.

97.     The Boeing Company Stock Fund does not need to pay for investment management, which constitutes the largest portion of most Funds' fees and expenses and thus the largest portion of Funds' expense ratios.

98.     By its very nature, The Boeing Company Stock Fund forgoes such investment management and holds an undiversified portfolio containing employer stock.  Thus, The Boeing Company Stock Fund should not assess investment management charges against participants' accounts.

99.     It is pivotal to participants' returns that such fees are not assessed against participants' savings in The Boeing Company Stock Fund or, if charged, are minimal.

100.     Further, it is crucial to participants' returns that The Boeing Company Stock Fund does not hold cash on a continuous basis.

101.     Nonetheless, The Boeing Company Stock Fund charges fees against Plan participants' accounts and holds substantial cash.

102.     Plan participants invest in The Boeing Company Stock Fund with the goal of sharing in their employer's financial success through the receipt of dividends and the increase in the value of the employer's stock.

103.    However, The Boeing Company Stock Fund's fees and expenses, and its cash holdings, undermine the extent to which participants can do so.  This is especially true when The Boeing Company Stock Fund's performance is compared to that of investors who purchase Boeing stock directly, instead of through the Plan.

104.    Participants who invest in The Boeing Company Stock Fund do not own shares of Boeing stock.  They own units of The Boeing Company Stock Fund.

105.    Each unit of The Boeing Company Stock Fund represents a portion of the shares of Boeing stock in The Boeing Company Stock Fund *and* a portion of the cash held by The Boeing Company Stock Fund.

106.    The value of each unit of The Boeing Company Stock Fund is based upon a combination of the Boeing stock value *and* the value of the cash (typically in money market investments and thus static) at any given time.

107.    As a result of the fees charged, and the cash held, in The Boeing Company Stock Fund, the return that a participant receives in The Boeing Company Stock Fund is lower than that of a non-Plan investor – a complete stranger to the Company who invests in Boeing stock for the same period.

108.    The amount of cash that The Boeing Company Stock Fund holds reduces the extent to which participants in The Boeing Company Stock Fund share in their employers' financial success.

109.    If the value of Boeing stock is rising, or if it is paying dividends, participants who place their retirement savings in The Boeing Company Stock Fund naturally want *every* dollar they save to earn such investment gains.

110.    But the portion of the participant's savings that remains in cash, and is not used to purchase Boeing stock, does not generate such investment gains.  Instead, its value remains essentially the same.

111.    For example, if a *non-Plan investor* purchases 100 shares of Boeing stock at $100 per share, and the share value thereafter rises by 10%, he or she has reaped a $1,000 gain on the initial $10,000 investment.

112.    However, a Plan participant placing the same $10,000 in The Boeing Company Stock Fund does not receive 100 shares of Boeing stock.  He or she receives The Boeing Company Stock Fund units representing an interest in the shares of employer stock held in the Fund *and* an interest in The Boeing Company Stock Fund's cash.

113.    If The Boeing Company Stock Fund holds 3 percent cash and 97 percent stock, the 10 percent increase in the value of the employer stock will translate into a $970 gain for the participant, while the value of the cash remains static.

114.    To make matters worse, the Plan participant investing $10,000 in The Boeing Company Stock Fund will also have to pay fees and expenses.  These fees and expenses will further reduce the participant's return.

115.    While this difference may seem modest, The Boeing Company Stock Fund is the largest of all Plan investment alternatives, containing more than $3.3 billion participant dollars.

116.    Boeing has violated, and is violating, its fiduciary obligations under ERISA by: (A) charging, and or allowing to be charged, excess and unreasonable fees and expenses to participants' retirement savings in The Boeing Company Stock Fund; and (B) maintaining and holding, causing to be maintained or held, or allowing to be maintained or held, excess cash in The Boeing Company Stock Fund and thereby impairing participants' returns.

**Failure to Capture Additional Compensation Streams For the Benefit of the Plan**

117.    Beyond collecting fees from the Plan through Hard Dollar and Revenue Sharing payments, Plan service providers receive additional, undisclosed compensation from their dealings with the Plan and Plan assets ("Additional Compensation Streams").  For example:

- consultants receive finders' fees from investment managers for the consultants' placement of Plan assets with the investment manager or mutual fund company;

- trustees or custodial banks perform cash sweeps of Plan accounts to capture cash before it is transferred to investment options, and earn interest ("float") on those cash holdings;

- investment managers, custodial banks, prime bankers, and/or mutual funds receive payments for lending securities, owned by the Plan, to third parties; and

- in connection with foreign investments, investment managers and mutual funds reap additional compensation from profiting on foreign currency exchange.

118.    In a multi-billion dollar plan, like the Plan here, such Additional Compensation Streams can result in millions of dollars of funds available to the Plan to defray and/or eliminate Plan expenses.

119.    Accordingly, Plan fiduciaries must also understand and consider these Additional Compensation Streams in fulfilling their fiduciary obligations to ensure that the full amount of available sums are captured for the Plan and applied solely for the benefit of the Plan and its participants and beneficiaries.

120.    Here, Defendants have failed to do so.

## Defendants' Inclusion of Mutual Funds Among
## The Plan's Investment Options

121.     The prudent and proper selection of investment options for the Plan is one of Defendants' core fiduciary obligations.

122.     From the mid 1990's until 2006, Defendants have included at least four mutual funds among the Plan's investment options.

123.     In 2005, the Master Trust held approximately $25 billion in assets.  In 2004, it held approximately $23 billion, and in 2003, $20 billion.

124.     In the financial and investments industry, a large institutional investor with billions of dollars, like the Plan, routinely can obtain lower prices for investment management and other services than can a retail investor with only thousands, or even millions, of dollars.

125.     Defendants – as fiduciaries of a multi-billion dollar retirement savings plan – had enormous bargaining leverage in the investment marketplace.  They squandered this leverage by subjecting the Plan and its participants to the high costs of publicly-traded mutual funds and failing to provide investment options with significantly lower costs.   *By the Defendants' own admission* this failure alone caused the Plan to pay approximately $10 million in excess and unnecessary expenses.

126.     As fiduciaries, Defendants were obligated to use the Plans' bargaining power to require that investment managers provide separate low cost investment accounts ("Separate Accounts") as Plan investment options.

127.     Separate Accounts are investment vehicles in which investment managers pool the assets of a large investor, like the Plan, into a private trust and manage them according to a stated investment objective.  Like mutual funds, Separate Accounts offer various investment styles (large cap, value, growth, balanced growth, small cap, international equity, etc.).

128.     However, Separate Accounts' operating expenses are substantially lower than those of mutual funds because they do not have to pay for advertising, marketing and distribution, nor do they have to maintain the liquidity required for trading in publicly-traded mutual funds.

129.     Separate accounts also avoid subjecting Plan participants to conflicts of interest inherent in large mutual fund organizations.  Mutual fund managers' own profit motive – driven by the assessment of fees against the fund's investments – conflict with investors' interest in reducing fees to maximize their returns.

130.     Defendants know this.  In 2006, the Plan eliminated mutual funds in favor of separate accounts and, in doing so – by their own admission – reduced the Plan's expenses by approximately $10 million.  But they did not, and have not, made good to the Plan for the many millions of dollars that the Plan paid in excess and unnecessary expenses in prior years.

### Defendants' Payments for Active Investment Management

131.     At least eight of the Plan's funds are actively-managed, and the Plan has included at least four actively-managed funds for years.  In actively-managed funds, the investment managers seek to outperform the Fund's benchmark, to "beat the market."  Active management is more expensive than passive management, in which Fund managers conform their holdings to those of a particular benchmark.  Passive managers provide market returns for low fees.

132.     The inclusion of actively-managed mutual funds is detrimental to the interests of the Plan and its participants and beneficiaries.  It repeatedly has been established that actively managed mutual funds rarely outperform market indexes on a risk-adjusted basis when held as long-term investments.

133.    Defendants' inclusion in the Plan of actively-managed funds provided (and provides) no added value to participants while forcing them to bear substantial and unnecessary fees.  Over time and on a risk-adjusted basis, the Plan's actively-managed Funds have under-performed, and are known to under-perform, comparable market indexes by at least as the level of such fees.

134.    Including actively-managed funds as investment options in the Plan virtually guaranteed that participants and beneficiaries would receive less than a market return on their long-term retirement savings, when they could have received market returns.  In doing so, Defendants breached their core fiduciary duties to the Plan.

**Defendants' Campaign of Concealment and Non-Disclosure**

135.    Here, despite the Defendants' duty to disclose full and accurate information regarding the fees and expenses assessed against participants' accounts, on an ongoing basis Defendants failed and refused to disclose to, and inform the participants of:

a.   the total amount of fees and expenses reasonable and necessary to operate the Plan;

b.   the total amount of amount of fees and expenses the Plan or the Master Trust actually paid to service providers in the form of Hard Dollar payments, Revenue Sharing and Additional Compensation Streams;

c.   the availability of Revenue Sharing and Additional Compensation Streams;

d.   the true and accurate details regarding the revenues and expenses of the Plan;

e.   the true and accurate operating expenses that reduce participants' returns, including both Hard Dollar payments and Revenue Sharing, for each of the Plan's or the Master Trust's investment options;

f.   the amount, when both any payments made by the Plan Sponsor combined with Hard Dollar Payments, Revenue Sharing, <u>and Additional Compensation Streams</u> are considered, by which the Plan's expenses exceeded those which were reasonable and incurred solely in participants' interests; and

g.   other revenue and expense information necessary for the participants to understand and protect their interests in the Plan.

136.   <u>Further, as set forth above, Defendants have concealed the amount of the recordkeeping and administrative costs of the Plan, and the fact that Defendants have ensured that such recordkeeping and administrative costs are borne by the Plan with soft dollars collected through undisclosed Revenue Sharing programs and/or Additional Compensation Streams.</u>

137.   <u>Further, as set forth above, Defendants have not disclosed, and/or have affirmatively concealed, a litany of material information including:</u>

A.   <u>That the Plan's size and asset value enabled Defendants to provide lower-priced investment options;</u>

B.   <u>That the fees charged, including fees for active investment management, assessed against participants' retirement savings were depriving them of the opportunity to receive market returns;</u>

C.   <u>That the excessive fees and expenses assessed against their accounts substantially would undermine the value of participants' retirement savings over time;</u>

D.   <u>That by including retail/publicly-traded mutual funds as Plan investment options, Defendants had squandered the Plan's enormous bargaining power and</u>

left participants of a $20 billion plan in the same circumstances as small, retail investors;

E.   That Plan service providers maintained undisclosed Revenue Sharing programs to collect soft dollars, the amounts they were receiving from transfers of those soft dollars, and that such amounts were excessive;

F.   That Revenue Sharing was, and is, available for the benefit of the Plan and its participants;

G.   That Plan service providers were and/or are receiving excessive payments via Additional Compensation Streams, and that such monies were available for the benefit of the Plan but not captured;

H.   That the expense ratios charged in Plan investment options were and are inflated to collect soft dollars for the purpose of supporting Revenue Sharing programs and, as a result, are *not* used for the investment management and operation of the investment option/Fund (*i.e.* the ostensible purpose for the imposition of such fees);

I.   That the expense ratios of Plan investment options/Funds are inflated to collect soft dollars used to support Revenue Sharing programs and soft dollar transfers so that the *stated expense ratio is not the true and accurate cost of investing* in the investment option/Fund;

J.   Who is receiving Plan assets, derived from participants' accounts, and collected as part of Revenue Sharing programs and/or Additional Compensation Streams;

K.      How much each service provider is paid with Plan assets, derived from participants' accounts, when Hard Dollar fees *and* Revenue Sharing transfers *and* Additional Compensation Streams are considered;

L.      Whether the total amount paid to services providers (*i.e.* disclosed, Hard Dollar fees *combined with* Revenue Sharing payments *and* Additional Compensation Streams) is reasonable in light of the services provided and incurred solely for participants' benefit;

M.      Whether plan fiduciaries have forgone available Revenue Sharing transfers and/or Additional Compensation Streams available in connection with Plan investment options, and thereby unnecessarily increased the expenses which Plan participants otherwise must bear;

N.      The true and accurate amount of recordkeeping and administrative fees that is assessed against participants' accounts in the Plan; in that Plan record keepers and administrators receive *both* the fees disclosed as Hard Dollar payments to them and *undisclosed* payments derived from Revenue Sharing programs;

O.      The true and accurate price of Plan investment options/Funds, in that the stated expense ratios of Plan investment options/Funds are overstated so as to collect extra, hidden soft dollars to be used to support Revenue Sharing programs to other Plan service providers;

P.      The true and accurate amount of fees paid to investment managers *for actual investment management services* (*i.e.* the actual amount of investment management being purchased) in any Plan investment option/Fund; in that the

investment management prices represented in the expense ratios of Plan

investment options/Funds are overstated so as to collect soft dollars to be used

for Revenue Sharing programs;

Q.      In actively-managed investment options/Funds, the actual amount of

active management services that Plan participants are purchasing, in that the

undisclosed collection of soft dollars via inflated expense ratios to support

Revenue Sharing programs renders participants incapable of knowing whether

the fees charged by actively-managed Funds actually are used for active

investment management rather for Revenue Sharing programs that provide no

benefit to fund investors; and

R.      Whether hidden payments of Plan assets, derived from participants'

accounts to support Revenue Sharing programs, are masking prohibited

transactions and/or conflicts of interests between or among Plan fiduciaries and

service providers;

138.    Because the Defendants failed and refused to provide them with this information,

and concealed this information from them, Plan participants have lacked the information

necessary for them: (a) to understand and protect their interests in the Plan; (b) to have

knowledge regarding the Defendants' breaches of fiduciary duty; and (c) to have reason to

believe they should make inquiry about those breaches and the facts underlying them.

139.    Defendants know that Plan participants lack such information and knowledge.

140.    In their fiduciary roles, Defendants are the parties with the information necessary

to know and understand whether the participants' rights and protections under ERISA are being,

or have been, violated.  ERISA fiduciaries, such as Defendants here, have an affirmative

obligation to provide full and accurate information to the Plan participants regarding the administration of the Plan.

141.     As a result of all of the foregoing, including Defendants' campaign of non-disclosure, concealment and misrepresentation, Plaintiffs and all Plan participants and beneficiaries have been forced to pay excessive fees and expenses from their 401(k) accounts, have suffered financial losses and damages, and have been deprived of the opportunity to receive market returns.

142.     Based upon the foregoing, the statue of limitations was tolled on the breaches set forth in this Complaint and did not begin to run until such time as Plaintiffs actually discovered them.

## COUNT I:
### [Breach of Fiduciary Duty – ERISA §502(a)(2)]

143.     Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 142 as though fully set forth here.

144.     As set forth in detail above, Defendants owe to the Plan, its participants and beneficiaries, and the Class extensive fiduciary duties including, without limitation:

A.  To conduct themselves as Plan Sponsor and Administrator with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent ERISA professional fiduciary would in operating and administering a 401(k) plan the size and character of the Plan;

B.  To perform their duties as Plan Sponsor and Administrator with the utmost loyalty and fidelity to the Plan and its participants and beneficiaries, avoiding at all times conflicts of interest, self-interest, and duplicity;

C.  To ensure, at all times, that Plan assets "shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan;"

D.  To track and account for all transactions involving the Plan and Plan assets so as to ensure that Plan assets are retained, managed, and disbursed in compliance with the Plan Document and ERISA;

E.  To track and account for all transactions involving the Plan and Plan assets so as to ensure that Plan assets "never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan;"

F.  To ensure that the fees and expenses incurred by the Plan are reasonable and incurred for the sole and exclusive benefit of Plan participants and beneficiaries;

G.  In entering into agreements with service providers to the Plan, to ensure that the payments from the Plan or Master Trust, whether they are direct or indirect, are reasonable for the services provided and made for the sole and exclusive benefit of Plan participants and beneficiaries;

H.  In operating and administering the Plan, to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plan were reasonable and incurred solely for the benefit of Plan participants;

I.   In operating and administering the Plan, on an ongoing basis to monitor the payments made by the Plan to service providers, whether they are direct or indirect, are and remain reasonable for the services provided and made for the sole and exclusive benefit of Plan participants and beneficiaries;

J.   To inform itself of, and understand, the various methods by which vendors in the 401(k) industry collect payments and other revenues from 401(k) plans;

K.   To inform itself of trends, developments, practices, and policies in the retirement, financial investment and securities industry which affect the Plan; and to remain aware and knowledgeable of such trends, practices and policies on an ongoing basis;

L.   To communicate with Plan participants and beneficiaries regarding the Plan honestly, clearly, completely, and accurately;

M.  To affirmatively and without request provide Plan participants and beneficiaries with honest, accurate, and complete information they need to understand their investments in the Plan, the management, risk, potential returns of such investments, and the fees and expenses incurred in connection with those investments;

N.   Upon request, to provide information to Plan participants and beneficiaries regarding the operation and administration of the Plan and the expenses incurred in doing so; and

O.   To provide honest, accurate and complete information to Plan participants and beneficiaries regarding the costs associated with their various investment choices and directions.

145.     As set forth in detail above, Defendants breached their fiduciary obligations to the Plan, Plan participants and beneficiaries and the Class by, among other conduct to be proven at trial:

A.   Causing the Plan to enter into agreements with service providers under which the Plan paid, directly or indirectly, completely or in-part, fees and expenses that were unreasonable and not incurred solely for the benefit of Plan participants and beneficiaries;

B.   Allowing the Plan to pay, directly on indirectly, fees and expenses that were unreasonable and not incurred solely for the benefit of Plan participants and beneficiaries;

C.   Squandering the Plan's enormous bargaining power to obtain low-cost investment options that provide market returns;

D.   Failing to monitor the fees and expenses paid by the Plan and, by such failure, causing, or allowing the Plan to pay fees and expenses that were unreasonable and not incurred solely for the benefit of Plan participants and beneficiaries;

E.   Failing to inform itself of trends, developments, practices, and policies in the retirement, financial investment, and securities industry that affect the Plan; and failing to remain aware and knowledgeable of such trends, practices, and policies on an ongoing basis;

F.   Failing to inform itself of, and understand, the various methods by which vendors in the 401(k) industry collect payments and other revenues from 401(k) plans;

G.  Failing to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plan were reasonable and incurred solely for the benefit of Plan participants;

H.  Failing to communicate with Plan participants and beneficiaries regarding the Plan honestly, clearly, and accurately;

I.  Failing properly to inform or disclose to Plan participants the fees and expenses that are, or have been, paid by the Plan;

J.  Failing to inform or disclose to Plan participants in proper detail and clarity the transactions, fees and expenses that affect participants' accounts balances in connection with the purchase or sale of interests in investment alternatives;

K.  Failing to discover, disclose and stop the charging of hidden and excessive fees to the Plan;

L.  Allowing Plan service providers, at the Plan's expense, to receive Revenue Sharing transfers, and failing to capture Revenue Sharing for the benefit of the Plan and its participants;

M.  Allowing Plan service providers, at the Plan's expense, to receive Additional Compensation Streams; and failing to capture Additional Compensation Streams for the benefit of the Plan and its participants;

N.  Failing to disclose to Plan participants and beneficiaries that the Plan's investment options subjected their retirement savings to excessive and unreasonable fees in light of the Plan's size and bargaining power in the investment marketplace;

O.  Failing to disclose to Plan participants and beneficiaries that Defendants had chosen plan investment options without considering appropriate information and investment alternatives in light of the Plan's size and asset value;

P.  By the foregoing conduct, failing to exercise the care, skill, prudence and diligence that a prudent person would when acting in like capacity and familiar with such matters.

146.    As set forth in detail above, as a result of these breaches, Plaintiffs, the Class, the Plan, and the Plan's participants and beneficiaries have suffered financial losses and damages.

147.    Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a)(2), Defendants are liable to restore to the Plan the losses it experienced as a direct result of Defendants' breaches of fiduciary duty, the profits it made from using Plan assets for its benefit, and are liable for any other available and appropriate equitable relief, including prospective injunctive relief and declaratory relief, and attorney's fees.

## COUNT II:
### [Other Remedies for Breach of Fiduciary Duty – ERISA §502(a)(3)]

148.    Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 147 as though fully set forth here.

149.    In addition to, and as an alternative to, the causes of action stated in Count I, Plaintiffs seek further relief pursuant to  ERISA § 502(a)(3), 29 U.S.C., § 1132(a)(3).

150.    Under ERISA §502(a)(3), a participant may enjoin any act which violates ERISA or may obtain other appropriate equitable relief to redress such violations or enforce the terms of ERISA.

151.     Defendants are the primary fiduciaries of the Plan and occupy a position of trust and confidence in connection with the Plan, the Plan's assets, and the Plan's participants and beneficiaries.

152.     Defendants have exclusive discretion and control over the Plan's assets and are strictly obligated to exercise that control "for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan."

153.     Although *only* Plan participants and beneficiaries are entitled to Plan assets and to the benefit of Plan assets, in the absence of full and candid disclosure from Defendants, Plan participants and beneficiaries do not know, and have no means of knowing, how their assets have been managed and disbursed.

154.     Accordingly, Defendants occupy the position of a common law trustee in connection with the Plan, its assets, and its participants and beneficiaries.

155.     As set forth in detail above, Defendants have caused and/or allowed the plan to pay, directly or indirectly, excess fees and expenses to Plan service providers and to Boeing itself.

156.     Defendants, and not the Plaintiffs, are the entities that have or should have specific and detailed information regarding how Plan assets have been treated and disbursed in this regard.

157.     Accordingly, the Court should order that Defendants render an accounting of all transactions, disbursements and dispositions occurring in, in connection with, or in respect of, the Plan and its assets.

158.     Plaintiffs respectfully request that the Court order that such an accounting include, without limitation, detailed and specific information regarding all fees and expenses incurred by the Plan or paid to third parties, whether paid directly by the Plan Sponsor (in part), the Plan, or the Master Trust or indirectly transferred among Plan service providers or other third parties, and the profit paid to Boeing or its subsidiaries from participants accounts.

159.     Plaintiffs respectfully request that the Court surcharge against the Defendants and in favor of the Plan all amounts involved in transactions which such accounting reveals were or are improper, excessive or in violation of ERISA.

160.     Plaintiffs further seek injunctive and other appropriate equitable relief to redress the wrongs described above and to cause them to cease in order for the Plan's participants and beneficiaries to receive the full benefit of their retirement savings in the future.

WHEREFORE Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- find and  declare that the Defendants have breached their fiduciary duties as described above;

- order the Defendants to make good to the Plan all losses that the Plan incurred as a result of the conduct described above and to restore the Plan to the position it would have been in but for the breaches of fiduciary duty;

- impose a constructive trust on any monies by which the Defendants were unjustly enriched as a result of their breaches of fiduciary duty and cause the Defendants to disgorge such monies and return them to the Plan;

- remove the fiduciaries who have breached their fiduciary duties or enjoin them from future breaches of ERISA;

- award actual damages to the Plan in the amount of its monetary losses;

- require Defendants to render an accounting as set forth above;

- surcharge against Defendants and in favor of the Plan all amounts involved in transaction which such accounting reveals were or are improper, excessive, or in violation of ERISA;

- permanently enjoin Defendants from breaching their fiduciary duties in each respect set forth in the Complaint;

- award to the Plaintiffs and the Class their attorneys fees and costs pursuant to ERISA § 502(g);

- order costs and attorneys fees pursuant to ERISA § 502(g) and the common fund doctrine;

- order equitable restitution or other available equitable relief against the Defendants;

- order the payment of interest to the extent it is allowed by law; and

- grant any other and further relief the Court deems appropriate.

Respectfully Submitted,

SCHLICHTER, BOGARD & DENTON

By:  /s/ Daniel V. Conlisk
  Jerome J. Schlichter, 32225
  Daniel V. Conlisk, 36544
  100 S. Fourth St., Suite 900
  St. Louis, Missouri 63102
  And
  120 W. Main Street, Ste 208
  Belleville, IL 62220
  (314) 621-6115
  (314) 621-7151 (Fax)
  dconlisk@uselaws.com

  ATTORNEYS FOR PLAINTIFFS/
  CLASS REPRESENTATIVES
  Gary Spano, John Bunk, and James
  White, Jr.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was served via electronic transmission on September 28, 2007 upon the following counsel of record:

Thomas E. Wack
Lisa Demet Martin
Jeffrey S. Russell
Kimberly A. Mohr
Bryan Cave LLP
211 North Broadway, Ste. 3600
St. Louis, MO 63102
(314) 259-2000
Attorneys for Defendants
tewack@bryancave.com
lmartin@bryancave.com
kimberly.mohr@bryancave.com
sabettis@bryancave.com
kmconard@bryancave.com


Of Counsel:
Christopher Rillo
Theodore Scallett
Groom Law Group
1701 Pennsylvania avenue, N.W.
Washington, D.C. 20006
(202) 861-5418
crillo@groom.com


Lars C. Golumbic
Edward A. Scallet
Groom Law Group, Chartered
1701 Pennsylvania Ave. NW
Suite 1200
Washington, DC 20006


                              _____/s/ Daniel Conlisk_____