## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **GARY SPANO, JOHN BUNK, and**<br>**JAMES WHITE, JR.,** | ) <br> ) <br> ) |
| **Plaintiffs,** | ) <br> ) |
| **vs.** | )   **Case No. 3:06-CV-743-NJR-DGW** <br> ) |
| **THE BOEING COMPANY, EMPLOYEE**<br>**BENEFITS PLANS COMMITTEE,**<br>**SCOTT M. BUCHANAN, and**<br>**EMPLOYEE BENEFITS INVESTMENT**<br>**COMMITTEE,** | ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| **Defendants.** | ) |

## <u>MEMORANDUM AND ORDER</u>

**ROSENSTENGEL, District Judge:**

Pending before the Court are two motions filed by Defendants The Boeing Company, Employee Benefits Plans Committee, Scott M. Buchanan, and Employee Benefits Investment Committee (collectively "Defendants"): a Motion for Summary Judgment on the Merits (Doc. 406) and a Motion for Summary Judgment based on ERISA's Statute of Repose (Doc. 407).   Also pending before the Court is a Motion to Strike (Doc. 412) filed by Plaintiffs Gary Spano, John Bunk, and James White, Jr. (collectively "Plaintiffs").   For the reasons set forth below, the Court denies the Motion for Summary Judgment on the Merits (Doc. 406), grants in part and denies in part the Motion for Summary Judgment based on ERISA's Statute of Repose (Doc. 407), and denies the Motion to Strike (Doc. 412).

FACTUAL AND PROCEDURAL BACKGROUND

This class action lawsuit involves a claim for breach of fiduciary duty brought pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 ("ERISA").  Plaintiffs Gary Spano, John Bunk, and James White, Jr., are current and former employees of The Boeing Company ("Boeing") who participated in The Boeing Company Voluntary Investment Plan ("the Plan"), a 401(k) plan offered by Boeing to its employees.  More specifically, the Plan is a multi-billion dollar defined contribution plan governed by ERISA (Doc 186, p. 26, ¶124).  Plan Participants contribute varying percentages of their earnings to the Plan (Doc. 186, p. 1, ¶2).  The Plan Participants' employer, Boeing, matches these contributions in varying percentages (Doc. 213-27, p. 22; Doc. 180-4, p. 6-7).  In a defined contribution plan such as this one, Plan Participants choose an investment avenue for contribution and are entitled to the value of their own investment accounts (Doc 186, p. 9, ¶28; Doc. 371, p. 9).

Plaintiffs allege that Defendants are Plan fiduciaries who have breached their fiduciary duties pursuant to ERISA § 409, 29 U.S.C. § 1109, ERISA §§ 502(a)(2), (3), 29 U.S.C. §§ 1132(a)(2), (3).  Plaintiffs allege two counts in the Second Amended Complaint: breach of fiduciary duty pursuant to ERISA §502(a)(2) (Count 1), and other remedies for breach of fiduciary duty pursuant to ERISA §502(a)(3) (Count 2) (*See* Doc. 186).

Defendant Boeing employs more than 150,000 employees across forty-eight states, with major operations in the Puget Sound area of Washington State, Southern California,

and St. Louis, Missouri (Doc 186, p. 4, ¶16).   Defendant Boeing is the Plan Sponsor who

provides the 401(k) plan for its employees (*Id*. at p. 2, ¶7).   Defendant Employee Benefit

Plan Committee (the "Committee") is the Plan Administrator, which is generally

responsible for the operation and administration of the Plan (Doc. 406, p. 3).   Defendant

Employee Benefits Investment Committee (the "EBIC") is the party that generally

chooses and monitors investment managers in the Plan (Doc 406, p. 3).   Defendant Scott

M. Buchanan is the employee designated to sign the Plan's annual reports (Doc. 406, p.

3).

The Plan has been administered through a Master Trust Agreement between

Boeing and State Street Bank and Trust Company, which later became CitiStreet

(hereafter "State Street/CitiStreet"), since October 1, 1997 (Doc. 408, p. 3; Doc. 186, p. 10,

¶30).[1]   The "Benefit Plan Administrative Services Contract" provides that State

Street/CitiStreet would be paid a "hard dollar" per-participant fee for its services and

would receive payments from certain mutual funds in the Plan under separate

arrangements it had with those funds (Doc. 406, p. 4; Doc. 213-20, p. 4-5, 24).   These

additional amounts are commonly referred to as "revenue sharing."[2]

Plan Participants may choose to invest in a selection of investment options (Doc.

189, p. 11, ¶36).   Some of the options offered were five passive index funds, along with

the Boeing Company Stock Fund and the Stable Value Fund (Doc. 406, p. 4).

[1] Prior to October 1997, Boeing managed the Plan in-house.
[2] Revenue sharing is an "arrangement allowing mutual funds to share a portion of the fees that they
collect from investors with entities that provide services to the mutual funds, the investors, or both."
*Leimkuehler v. American United Life Ins. Co.*, 713 F.3d 905, 907 (7th Cir. 2013).

Defendants also included four actively managed mutual funds (Technology Fund, Small Cap Fund, Value Fund, and Growth Fund) (Doc. 406, p. 5).   Funds are chosen for plan inclusion by investment managers who are paid for their service out of the Plan (Doc. 186, p. 20-21, ¶85-86).

Plaintiffs allege a breach of fiduciary duty by Defendants for causing or allowing unreasonable fees and expenses to be charged against the assets of the Plan and by failing to ensure that the Plan's assets were used solely for the exclusive purpose of providing benefits to Plan Participants.  Plaintiffs allege that Defendants caused the Plan to pay unreasonable administrative fees to its recordkeeper State Street/CitiStreet. Additionally, Plaintiffs allege that Defendants selected and retained mutual funds as Plan investment options until 2006, which charged excessive investment management expenses and were the vehicle Defendants used to funnel excessive Plan recordkeeping and administrative fees to State Street/CitiStreet via revenue sharing.   Plaintiffs further allege that the Small Cap Fund provided additional revenue sharing fees to State Street/CitiStreet and charged its investors one hundred and seven basis points per year in fees, which was grossly excessive, in order to benefit Defendants' corporate relationship with State Street/CitiStreet.   Plaintiffs further allege that Defendants failed to monitor and remove an imprudently risky concentrated sector fund, i.e. the Technology Fund, and instead retained this fund for the purpose of benefiting its corporate relationship, rather than for the sole benefit of the Plan Participants.   Lastly, Plaintiffs allege that the Boeing Company Stock Fund incurred excessive fees and held

excessive cash, impairing the value of the Plan assets.   With regard to this fund, Plaintiffs also allege that Defendants failed to remedy the resulting transaction and institutional drag.

This case has generated a lengthy procedural history, which is only briefly summarized here.   The case was filed in September 2006 and originally assigned to Judge James L. Foreman, who has since retired and passed away.   In October 2006, the case was reassigned to Judge David R. Herndon.   In September 2008, Judge Herndon granted Plaintiffs' Motion for Class Certification and certified the following class:

> All persons, excluding the Defendants and/or other individuals who are or may be liable for the conduct described in this Complaint, who are or were participants or beneficiaries of the Plan and who are, were or may have been affected by the conduct set forth in this Complaint, as well as those who will become participants or beneficiaries of the Plan in the future.

(Doc. 193).   Shortly thereafter, Defendants appealed Judge Herndon's Order to the Seventh Circuit Court of Appeals (Docs. 279, 288).   In January 2011, the Seventh Circuit reversed Judge Herndon's Order granting class certification and remanded the case for further proceedings.   *See Spano v. The Boeing Co.*, 633 F.3d 574 (7th Cir. 2011).   On March 2, 2011, Plaintiffs filed an Amended Motion to Certify Class (Doc. 309), and on September 19, 2013, Judge Herndon certified the following class with subclasses (*See* Doc. 397):

> <u>Administrative Fee claim and class</u>: All participants or beneficiaries of the Boeing Voluntary Investment Plan, excluding the Defendants, members of the Defendant committees, and the Boeing directors, who had an account balance at any time between September 28, 2000 and December 31, 2006, as all participants during that time paid recordkeeping fees.

Mutual Fund Subclass: All participants or beneficiaries of Boeing Voluntary Investment Plan, excluding the Defendants, members of the Defendant committees, and the Boeing directs, who, between September 28, 2000 and December 31, 2005, invested in any of the Plan's mutual funds, since each mutual fund during this time were laden with imprudently excessive fees.

Small Cap Fund Subclass: All participants or beneficiaries of the Boeing Voluntary Investment Plan, excluding the Defendants, members of the Defendant committees, and the Boeing directors, who, between September 28, 2000 and December 31, 2005, invested in the Small Cap mutual fund in the Plan.

Technology Fund Subclass: All participants or beneficiaries of the Boeing Voluntary Investment Plan, excluding the Defendants, members of the Defendant committees, and the Boeing directors, who, between September 28, 2000 and December 31, 2005 invested in the Plan's Technology Fund and whose investment in the Technology underperformed that of the diversified domestic equity markets as represented by the Standard and Poor's 500 Index Fund minus 5 basis points for investment management.

Company Stock Fund Subclass: All participants or beneficiaries of the Boeing Voluntary Investment Plan, excluding the Defendants, members of the Defendant committees, and the Boeing directors, who, between September 28, 2000 and December 31, 2006 invested in the Plan's Boeing Company Stock and whose investment in the Boeing Company Stock Fund underperformed that of Boeing Company Stock.

On January 8, 2014, Defendants filed two Motions for Summary Judgment: a Motion for Summary Judgment on the Merits (Doc. 406) and a Motion for Summary Judgment Based on ERISA's Statute of Repose (Doc. 407). On February 10, 2014, Plaintiffs filed timely response briefs (Docs. 408, 409). On February 24, 2014, Defendants filed replies to both motions (Docs. 410, 411). One day later, Plaintiffs filed a Motion to Strike (Doc. 412) both reply briefs. On March 24, 2014, Defendants filed a Notice of Supplemental Authority (Doc. 419). Plaintiffs subsequently filed Notices of

Supplemental Authority on April 17, 2014 (Doc. 423), July 17, 2014 (Doc. 445), August 25, 2014 (Doc. 454), and October 6, 2014 (Doc. 463).

On May 19, 2014, the case was transferred to the undersigned District Judge (Doc. 425). The Final Pretrial Conference was reset to September 22, 2014, with a presumptive Bench Trial month of October 2014. On August 4, 2014, the undersigned District Judge held a hearing on the Motions for Summary Judgment (*See* Doc. 448). At that hearing, the trial setting was canceled pending a ruling on the motions.

RELEVANT LEGAL STANDARDS

## I.      Summary Judgment Standard of Review

Summary Judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (*quoting* FED. R. CIV. P. 56(a)). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A "court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence . . . ." *Reid v. Neighborhood Assistance Corp. of America*, 749 F.3d 581, 586 (7th Cir. 2014) (*quoting Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005)).

## II.     ERISA General Provisions

ERISA imposes upon fiduciaries twin duties of loyalty and prudence, requiring them to act "solely in the interest of [plan] participants and beneficiaries" and to carry out their duties "with the care, skill, prudence, and diligence" as would a prudent man under the same circumstances.   *See* 29 U.S.C. § 1104(a)(1); *Jenkins v. Yager*, 444 F.3d 916, 924 (7th Cir. 2006).   A claim of breach of fiduciary duty under ERISA requires Plaintiffs to prove: "(1) that the defendants are plan fiduciaries; (2) that the defendants breached their fiduciary duties; and (3) that the breach caused harm to the plaintiff."   *Jenkins,* 444 F.3d at 924.   There is no dispute as to the Defendants' status as fiduciaries.

"Under ERISA, a fiduciary's failure to exercise his or her discretion – i.e., to balance the relevant factors and make a reasoned decision as to the preferred course of action – under circumstances in which a prudent fiduciary would have done so is a breach of the prudent man standard of care."   *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 796 (7th Cir. 2011); *DiFelice v. U.S. Airways, Inc.*, 479 F.3d 410, 420-41 (4th Cir. 2007).   As the parties point out in the briefing, there are conflicting views among the circuits regarding the standard of review for a claim of breach of the duties of loyalty and prudence.   *See John Blair Communications, Inc. Profit Sharing Plan v. Telemundo Group, Inc. Profit Sharing Plan*, 26 F.3d 360, 368-370 (1994) (the Second Circuit held that *de novo* review applies to a claim that the fiduciary breached its duty of loyalty by using investment gains from one plan's assets to benefit another plan"); *but see Ganton Techs., Inc. v. National Indus. Group Pension Plan*, 76 F.3d 462, 466-467 (2d Cir. 1996) (applying deferential review to a breach-of-loyalty claim); *see also Tussey v. ABB, Inc.*, 746 F.3d 327,

333-335, 336, 338 (8th Cir.), *cert. denied*, 135 S. Ct. 477 (2014) (Eighth Circuit held that abuse-of-discretion review applies to a plan interpretation that arises in the context of claims that fiduciaries breached the duties of prudence and loyalty).   The Seventh Circuit has found that prudence "involves a balancing of competing interests under conditions of uncertainty," and thus the Court will review the Defendant fiduciaries' actions for abuse of discretion.   *See Armstrong v. LaSalle Bank Nat. Ass'n*, 446 F.3d 728, 733 (7th Cir. 2006) ("a decision that involves a balancing of competing interests under conditions of uncertainty requires an exercise of discretion, and the standard of judicial review of discretionary judgments is abuse of discretion.").

DISCUSSION

## I.    Plaintiffs' Motion to Strike Defendants' Reply Briefs (Doc. 412)

The Court initially considers Plaintiffs' Motion to Strike Defendants' Reply Briefs (Doc. 412).   In the motion, Plaintiffs urge the Court to strike Defendants' reply briefs because Defendants have failed "to demonstrate any exceptional circumstances warranting replies." (Doc. 412, p.1).   Local Rule 7.1 (c) provides in bold type that "[r]eply briefs are not favored and should be filed only in exceptional circumstances." SDIL-LR 7.1(c).   It also provides that "the party filing the reply brief shall state the exceptional circumstances."   *Id*.   Contrary to Plaintiffs' assertions, Defendants did set forth their exceptional circumstances in both of their reply briefs (*See* Doc. 410, p. 1, FN *; Doc. 411, p. 2).   Further, this district does not require the parties to seek leave of Court in order to file a reply.   Given the fact that the undersigned District Judge received this

case from the docket of Judge Herndon at this late stage in the litigation, the undersigned District Judge finds the reply briefs to be helpful.   For these reasons, the Court denies Plaintiffs' Motion to Strike Defendants' Reply Briefs (Doc. 412).

## II.   Defendants' Motion for Summary Judgment Based on ERISA's Statute of Repose (Doc. 407)

In their Motion for Summary Judgment Based on ERISA's Statute of Repose (Doc. 407), Defendants argue that the six-year statute bars all claims based on events that arose prior to September 28, 2000, and there are no exceptions that apply to toll the statute. As the party seeking summary judgment based on the six-year statute, Defendants bear the burden of identifying evidence which shows that the conduct alleged occurred more than six years prior to the commencement of this action on September 28, 2006.   *See Avery v. Mapco Gas Prods., Inc.*, 18 F.3d 448, 452 (7th Cir. 1994).   If Defendants satisfy that burden, Plaintiffs "are obligated to come forward with evidence sufficient to establish a genuine factual dispute as to when [the conduct occurred]."   *Id.*

ERISA provides that any Plan Fiduciary who breaches its fiduciary duty is "personally liable to make good to such plan any losses to the plan resulting from each such breach."   29 U.S.C. §1109.   ERISA section 1113 sets timeliness standards for this type of action, providing no action may be commenced with respect to a fiduciary's breach after the earlier of:

(1) six years after the (A) date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach; or

(2) three years after the earliest date on which the plaintiff had actual

knowledge of the breach or violation;

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113. Defendants do not make any argument as to the three-year limitations period under subsection (2). Instead, Defendants proceed solely under subsection (1), the six-year provision (*See* Doc. 448, p. 5; Doc. 407, p. 1).

Section 1113(1) of ERISA establishes an outside limit of six years in which to file suit. This section is activated by the timing of a defendant's conduct ("the date of the last action which constituted a part of the breach or violation"), which is in contrast to 1113(2), which is triggered by plaintiffs' knowledge of the conduct. *See, e.g., Fish v. GreatBanc Trust Co.,* 749 F.3d 671, 678 (7th Cir. 2014) ("The application of the three-year exception to the six-year default rule turns on the meaning of 'actual knowledge.'"). This action was commenced on September 28, 2006, thus the six-year statute bars claims which arose prior to **September 28, 2000**.

## A. The Six-Year Statute and Plaintiffs' Claims

Because the six-year statute bars any claims arising prior to September 28, 2000, the Court must first look to the particular claims that Plaintiffs have asserted and the timing of Defendants' allegedly imprudent conduct.

Plaintiffs assert five fiduciary breach claims, and Judge Herndon certified a class (Administrative Fee class) and four separate subclasses (Mutual Fund subclass, Small Cap Fund subclass, Technology Fund subclass, and Company Stock Fund subclass) for

each of these claims (Doc. 398, p. 28-29).   It is undisputed that each of the four funds mentioned above were initially included as part of the Plan in or before 1997, when the Plan was amended to make a greater number of investment options available to Plan Participants (Doc. 406, p. 3; Doc. 372, p. 6, 25-28; Doc. 409, p. 4; Doc. 213-7, p. 1-2). Plaintiffs assert, however, that fiduciary breaches relating to each of these funds occurred *throughout* the six years preceding the filing of this case on September 28, 2006, as well as further back to 1997.

As to the Administrative Fee claim and class, Plaintiffs assert that, from 1997 through 2006, Defendants failed to solicit competitive bids for Plan administrative services to ensure Plan administrative fees were reasonable (*Id*. at p. 6).   More specifically, Plaintiffs assert that, in the six years preceding this action, Defendants caused the Plan to pay unreasonable administrative expenses in the form of hard-dollar per-participant charges, additional open-ended asset-based "revenue sharing" payments deducted from Plan investments, and "float" (interest on Plan assets pending distribution) as a result of Defendants' desire to further its corporate relationship with State Street/CitiStreet (Doc. 409, p. 5).

As to the Mutual Fund and Small Cap Fund claims, Plaintiffs assert that Defendants had a continuing duty to review plan investments and eliminate funds that imposed unreasonable fees, such as its mutual fund fees that were not competitive compared to other multi-billion dollar plans.   Plaintiffs allege that Defendants continued to choose excessively priced mutual funds in order to benefit Boeing's

corporate relationship with State Street/CitiStreet (Doc. 409, p. 7-8).   Plaintiffs further assert that, throughout the six years preceding this action, Defendants breached their duty to monitor the Plan's fees for reasonableness and to eliminate funds which imposed unreasonable fees (*Id.*).

As to the Technology Fund claim, Plaintiffs assert that throughout the six years preceding this case, Defendants failed to remove the imprudent Technology Fund from the Plan (*Id.* at p. 7).   Specifically, Plaintiffs assert that, from 2000-2002, this fund had seventy-eight percent of its assets invested in a single highly volatile industry, and this would have prompted a prudent fiduciary to remove the fund (*Id.*).   Plaintiffs further assert that when Defendants replaced this fund in 2004, they selected the replacement Dreyfus Fund based on political reasons, not prudency (*Id.*).

As to the Company Stock Fund claim, Plaintiffs allege that, "at any time within the six-year limitation period, Defendants could have examined prudent alternatives to its Company Stock Fund operation and acted, in light of the transaction drag which diluted participant returns, to stop holding excess cash or to move to an alternative structure." (Doc. 409, p. 9).

Defendants contend that many of the claims against them arise from the initial decision to offer particular investment vehicles, a decision which took place before the limitations cut-off of September 28, 2000, and, therefore, most of Plaintiffs' claims are time-barred (Doc. 407).   Defendants concede, however, that the following three distinct claims are *not* barred by the six-year statute: (1) claims based upon substitution of

Invesco as investment manager for the Technology Fund in 2004; (2) the renegotiated contract with State Street/CitiStreet over administrative fees in 2002; and (3) the alleged failure to monitor performance and fees after September 28, 2000 (*See* Doc. 448, p. 7). With the exception of these three claims, Defendants assert that all of Plaintiffs' claims are barred by the six-year statute.

Defendants rely heavily on several Circuit Court holdings addressing ERISA's six-year limitations period, none of which include the Seventh Circuit Court of Appeals. *See Fuller v. SunTrust Banks, Inc.*, 744 F.3d 685 (11th Cir. 2014); *David v. Alphin*, 704 F.3d 327 (4th Cir. 2013); *Tibble v. Edison Int'l.*, 729 F.3d 1110 (9th Cir. 2013).   *Fuller*, *Alphin*, and *Tibble* all stand for the proposition that a challenge to the initial selection of a fund is barred by limitations where the selection was made prior to the six-year limitations period cut-off, and no further allegation of imprudent acts were made during the limitations period.  *Fuller*, 744 F.3d at 701; *Alphin* 704 F.3d at 327; *Tibble*, 729 F.3d at 1120-21.  Thus, under the rule Defendants urge this Court follow, unless Plaintiffs alleged sufficient facts to support a changed circumstance engendering a new breach, no claim arising from an initial selection prior to September 28, 2000, would survive.

The Seventh Circuit, however, holds ERISA fiduciaries to the same duty of prudence after initial selection as before.  *Martin v. Consultants & Administrators, Inc.*, 966 F.2d 1078, 1087-88 (7th Cir. 1992).  Under *Martin*, a fiduciary is held liable on a repeated basis after the initial decision to offer an imprudent investment, on the theory that each day in which a fiduciary fails to remove an imprudent investment, a new

breach is born.  *Id*.  The Court noted in *Martin* the "continuing nature of a trustee's
duty under ERISA to review plan investments and eliminate imprudent ones." *Id*.
Essentially, the holding is a reiteration of the longstanding principle that an ERISA
trustee has an *ongoing* duty to act prudently.  Indeed, "[i]f knowledge of an ERISA
violation barred claims based on similar future conduct, this continuing fiduciary duty
would be severely weakened, and trustees would be left free to engage in repeated
violations, so long as they have once been discovered but not sued."   *Id*.

Here, Defendants correctly point out that Plaintiffs' claims include actions and
omissions that occurred prior to the limitations period.   Indeed, the initial decision to
offer and implement revenue sharing, the four mutual funds, and the Company Stock
Fund, occurred in (or before) 1997.  For example, for claims that arose in 1997, the
cut-off would be 2003 (six-years later), and since Plaintiffs did not file suit until 2006,
these claims are barred.  Similarly, any claim relating to unreasonable administrative
fees and Defendants' failure to review and eliminate allegedly imprudent funds that
took place *before* September 28, 2000, is also time-barred.

In this case, however, Plaintiffs' challenges do not merely contest actions and
omissions occurring prior to September 28, 2000.   For each of the five claims, Plaintiffs
have identified actions and/or omissions that –- *after* September 28, 2000 -- constitute
distinct breaches of fiduciary duties.   For example, Plaintiffs assert that, during the six
years before they filed suit, Defendants failed to solicit competitive bids for Plan
administrative services to ensure that Plan administrative fees were reasonable,

continued to use excessively priced mutual funds for imprudent reasons, failed to monitor and remove the Technology Fund, and failed to examine a prudent alternative to the management of the Company Stock Fund in light of the drag that diluted participant returns.   The claims that Defendants failed to review plan investment options or eliminate imprudent investment options can constitute a new and distinct breach of Defendants' ongoing fiduciary duty to manage plan assets prudently.   *See Martin*, 966 F.2d at 1087-88 (Under ERISA, a fiduciary has a continuing duty to "review plan investments and eliminate imprudent ones.") (citing 29 U.S.C. § 1104(a)(1)(B)); *see also Boeckman v. A.G. Edwards, Inc.*, 461 F. Supp. 2d 801, 814 (S.D. Ill. 2006) ("[A]n ERISA fiduciary has an ongoing duty to manage an investment with reasonable diligence because the 'fiduciary duty under ERISA is continuous.'"); *see also Morrissey v. Curran*, 567 F.2d 546, 549 n. 9 (2d Cir. 1977).   Therefore, the six-year statute does not bar those actions or omissions that took place *after* September 28, 2000.

With respect to the Ninth Circuit *Tibble* decision that Defendants heavily rely on, the Court notes that the United States Supreme Court granted *certiorari* on October 2, 2014, for review on the issue of "whether a claim that ERISA plan fiduciaries breached their duty of prudence by offering higher-cost retail-class mutual funds to plan participants, even though identical lower-cost institutional-class mutual funds were available, is barred by 29 U.S.C. § 1113(1) when fiduciaries initially chose the higher-cost mutual funds as plan investments more than six years before the claim was filed." *Tibble v. Edison Int'l*, No. 13-550, 2014 WL 4916188 (2014).   In making its determination

on whether to grant *certiorari*, the Supreme Court called for the views of the Solicitor
General.   In response, the Solicitor General filed an amicus brief recommending that the
Supreme Court grant the petition as to the limitations issue (*See* Doc. 454-1).

The amicus brief asserts that the Ninth Circuit erred in concluding that Section
1113(1) bars petitioners' claims that respondents breached their duty of prudence by
offering higher cost retail-class mutual funds, rather than identical lower-cost
institutional-class funds, because the higher-cost funds were first selected as plan
investments before the limitations period (Doc. 454-1, p. 13).   The Solicitor General
reasoned that this is because plan fiduciaries have a "continuing fiduciary duty" to
"review plan investments and eliminate imprudent ones," and a fiduciary "breaches
that duty when it fails to monitor and periodically evaluate the performance of and fees
charged by plan investments, fails to investigate alternative investment options, and
fails to remove funds that shortchange participants by charging excessive fees."   (*Id*. at
p. 14).   The Solicitor General's brief, of course, noted the circuit split between the
Fourth, Eleventh, and Ninth Circuits (on one side of the split), and the Second and
Seventh Circuits (on the opposite side of the split) (Doc. 454-1, p.19-20).

Also, the Court finds this case to be distinguishable from the Seventh Circuit case
of *Librizzi v. Children's Memorial Medical Center*, 134 F.3d 1302 (7th Cir. 1998).   In *Librizzi*,
the Seventh Circuit was concerned with the three-year limitations period in § 1113(2),
which begins on the date an employee first learns of the fiduciary's breach.   That
provision is a different section of ERISA's statute of limitations than is at issue here.

Furthermore, the Seventh Circuit's statements relating to § 1113(1) in *Librizzi* support Plaintiffs' position.

A brief background of the *Librizzi* case is necessary. *Librizzi* involved an employee of Children's Hospital Medical Center who filed an ERISA fiduciary suit in April 1996 claiming that his employer gave him inaccurate information in 1990 about disability benefits that caused him to elect early retirement benefits (instead of regular retirement benefits). *Id*. at 1304. The employee claimed that this decision cost him money because, once he reached the regular retirement benefits eligibility age, his payments were lower since he elected early benefits. *Id*. The employee argued that the statute of limitations should not have started to run until Children's Hospital stopped negotiating with him about his benefits because the fiduciary breach "did not really occur until the employer failed to correct its error." *Id*. at 1306.

The Court of Appeals rejected this argument, observing that the plaintiff "verges on the argument that, because the [defendant] still can top up his benefits, the time has not yet begun to run." *Id*. at 1306. The Court "doubt[ed] that [the *Librizzi* case was] an 'omission' case to begin with, or that the date of 'cure' would extend beyond" the date he began receiving disability benefits. *Id*. at 1307. The Court of Appeals went on to explain that "cure" means "fix," as distinguished from "provide a remedy" in the sense of "damages for what can no longer be fixed, lest § 1113(1)(B) mean that the time never runs out." *Id*. Here, in contrast to *Librizzi*, Plaintiffs are asserting that Defendants' omissions were a true failure to *fix*, for example, failing to remove the imprudent mutual

funds and switching to lower-cost separate accounts or failing to prudently consider and address the transactional and institutional drag associated with the Boeing Company Stock Fund.

Defendants also argue that the "continuing violation theory" is invalid under ERISA.   But Plaintiffs do not argue that there was a "continuing violation," in the sense of one violation starting on the date of the initial selection of investments that permits them to obtain damages reaching back to that date, where they cannot show fraud or concealment (*See* Doc. 448, p. 19-20).   Instead, Plaintiffs contend that Defendants breached a continuing duty of prudence during the limitations period by failing to monitor the Plan and failing to make sure that the investments were prudent and expenses were reasonable (*Id*.).   Where Plaintiffs can show *fraud or concealment*, however, they seek to obtain damages reaching back to 1997.   This argument will be addressed in the next section.

### B.  Fraud or Concealment Exception

Defendants also seek summary judgment on the issue of fraudulent concealment. Plaintiffs seek to extend the limitations period *prior to* September 28, 2000, based on the fraud or concealment exception to ERISA section 1113 limitations.   The Seventh Circuit has read ERISA's fraud or concealment exception to incorporate the fraudulent concealment doctrine.   *Radiology Ctr., S.C. v. Stifel, Nicolaus & Co.*, 919 F.2d 1216 (7th Cir. 1990).   The fraud or concealment exception to Section 1113 tolls the limitations period when the defendant has prevented Plaintiffs' timely discovery of the breach or violation. *Id.* at 1220.   "An ERISA fiduciary commits fraud or concealment by delaying a wronged beneficiary's discovery of his claim either by misrepresenting the significance of facts the beneficiary is aware of (fraud) or by hiding facts so that the beneficiary does not become aware of them (concealment)." *Laskin v. Siegel,* 728 F.3d 731, 735 (7th Cir. 2013) (citing *Radiology*, 919 F.2d at 1220).

The fraud or concealment exception requires "(1) that defendants engaged in a course of conduct designed to conceal evidence of their alleged wrongdoing and that (2) [Plaintiffs] were not on actual or constructive notice of that evidence, despite (3) their exercise of due diligence."   *Schaefer v. Ark. Med. Soc'y*, 853 F.3d 1487, 1491-92 (8th Cir. 1988); *accord Brown v. Owens Corning Inv. Review Comm'n*, 622 F.3d 564, 573 (6th Cir. 2010); *Larson v. Northrop Corp.*, 21 F.3d 1164, 1172 (D.C. Cir. 1994).   Actual concealment is required -- "i.e., some trick or contrivance intended to exclude suspicion and prevent inquiry."   *Martin v. Consultants & Adm'rs, Inc.*, 966 F.2d 1078, 1095 (7th Cir. 1992).

"Concealment by mere silence is not enough."   *Martin*, 966 F.2d at 1094; *Ranke v. Sanofor-Synthelabo, Inc.*, 416 F.2d 197, 204 (3d Cir. 2006).   It is a plaintiff's burden to prove evidence supporting the application of the fraud or concealment exception to ERISA's statute of limitations.   *George v. Kraft Foods Global, Inc.*, 814 F. Supp. 2d 832, 848 (N.D. Ill. 2011) (citing *Firstcom, Inc. v. Qwest Corp.*, 555 F.3d 669, 675 (8th Cir. 2009)); *see also Laskin v. Siegel*, 728 F.3d 732, 735 (7th Cir. 2013).

Here, Plaintiffs have not set forth sufficient evidence to carry the fraud or concealment exception.   With respect to the Technology Fund, Plaintiffs assert that Defendants misrepresented the risk of excessive concentration posed by this fund by stating that it "may be appropriate for individuals who would like to diversify their portfolios into different kinds of stock funds," thereby suggesting that the Technology Fund was a means by which to obtain that diversification (Doc. 409, p. 18).   Defendants have set forth evidence, however, which shows that they distributed several types of communications (such as summary plan descriptions, brochures, and "Investing Basics" kits) that advised Plan Participants that the Technology Fund was <u>not</u> well diversified across a variety of industries (Doc. 407, p. 17; Doc. 213-12, p. 14-15; Doc. 213-13, p. 5; Doc. 213-14, p. 15).   For example, the "Investing Basics" kit, which was distributed to Participants to describe the investment options and ways to build an investment portfolio, includes a Q&A section relating to the Technology Fund.   One of the questions asks "what are the risks?" to which the answer explains, *inter alia*, "[a] fund that invests in a specific sector, such as technology, may be subject to greater price

fluctuations because it is not well diversified across a variety of industries." (Doc. 213-9, p. 15).   Further, the Voluntary Investment Plan 2000 edition explains that "[t]he fund may be appropriate for individuals who can tolerate volatility and who have an investment time horizon of at least ten years." (Doc. 213-10, p. 5).

Plaintiffs also assert that, with respect to the Company Stock Fund, Defendants misrepresented that investing in this fund was the same as investing in Boeing stock. This assertion was false, because the Company Stock fund also invested in minimally-yielding cash equivalents and its returns deviated from Boeing stock due to the cash fees paid to Boeing's banker for managing the fund (Doc. 409, p. 19-20).   But Defendants have set forth evidence demonstrating that they disclosed the cash component of that fund (Doc. 407, p. 15; Doc. 213-19, p. 4, 9, 11).   For example, in the Voluntary Investment Plan 1998 Edition, the description of the Company Stock Fund reads as follows: "This Fund invests primarily in Boeing common stock.   The Fund also holds a small amount (generally not more than 4 percent) in cash or cash equivalents." (Doc. 213-19, p. 4).   The 2006 edition also discloses the cash component of that fund (Doc. 213-19, p. 9).

Plaintiffs also allege that the Plan fee structure was designed to mislead Plan Participants.   The Seventh Circuit held in *Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009) that "[t]he total fee, not the internal, post-collection distribution of the fee, is the critical figure for someone interested in the cost of including a certain investment in her portfolio and the net value of that investment."   *Id.* at 586.   Here, Defendants have

provided evidence demonstrating that they disclosed the total fees through fee matrices (Doc. 407, p. 19; Doc. 213-7, p. 7-8; Doc. 213-23, p. 1- 9).   Specifically, Gary Wilson (Senior Manager of the Shared Services Group at Boeing) stated in his affidavit that, since 2001, the "Boeing Savings Plan On-Line" website has provided a fee matrix, which lists the fund management fee, other expenses, and total expenses for each fund in the Plan (Doc. 231-7, p. 7-8).   These matrices are attached as Exhibit 14 to his affidavit (Doc. 213-23, p. 1-9).

Thus, even if Participants were not clearly apprised of the revenue sharing fee component, every participant was made aware of the *total* fees they paid.   Plaintiffs have failed to support the contention that Participants were misled by fraud or concealment as to the total fees they paid, as Boeing provided Participants with regular account statements, including the total fees assessed.[3]   Therefore, with respect to the fraud or concealment provision, the Court grants summary judgment in favor of Defendants.   As the fraud or concealment exception does not apply here, claims that arose prior to September 28, 2000, are still foreclosed by the six-year statute.   Plaintiffs may only seek damages for actions or omissions that took place on or after September 28, 2000.

---

[3]As explained in more detail below, although total fees were disclosed to Plan Participants (and thus Plaintiffs have not satisfied their burden of supplying evidence to show fraud or concealment as to the revenue sharing arrangement), this does not mean that Plaintiffs' merits-based argument regarding revenue sharing is foreclosed by *Hecker*.   Plaintiffs' merits-based argument goes beyond a mere "disclosure" argument and instead attacks the prudency of Defendants' retention of funds in order to provide revenue sharing to further Defendants' corporate relationship with State Street/CitiStreet, and Plaintiffs further assert that this resulted in unreasonable administrative fees paid to State Street/CitiStreet.   Although the Court finds that there are genuine issues of fact as to whether Defendants acted imprudently by making decisions in order to further their corporate banking relationship with State Street/CitiStreet (analysis below), Plaintiffs have not set forth sufficient evidence demonstrating that Defendants engaged in "some trick or contrivance intended to exclude suspicion and prevent inquiry" by Plan Participants as to this relationship with State Street/CitiStreet.

### III.      Defendants' Motion for Summary Judgment on the Merits (Doc. 406)

Defendants have moved for summary judgment on each of Plaintiffs' claims

alleging breach of fiduciary duties under ERISA (Doc. 406).   ERISA fiduciary duties are

the highest known to the law.   *George v. Kraft Foods Global, Inc.*, 814 F. Supp. 2d 832, 852

(N.D. Ill. 2011) (internal quotations omitted).   A claim of breach of fiduciary duty under

ERISA requires Plaintiffs to prove: "(1) that the defendants are plan fiduciaries; (2) that

the defendants breached their fiduciary duties; and (3) that the breach caused harm to

the plaintiff." *Jenkins v. Yager*, 444 F.3d 916, 924 (7th Cir. 2006).   Under ERISA, "a

fiduciary shall discharge his duties with respect to a plan solely in the interest of the

participants and the beneficiaries" for the purpose of providing benefits to Participants

and defraying reasonable expenses while administering the plan.   29 U.S.C. §1104 (a)(1).

An ERISA fiduciary always carries a duty to act (or not act) with "care, skill, prudence,

and diligence under the conditions then prevailing" and to discharge those duties

"solely in the interest of the [Plan] participants and beneficiaries."   29 U.S.C. 1104(a)(2)

and (a)(1)(B).   A fiduciary breaches the standard of care when he or she fails to exercise

discretion in circumstances where a prudent fiduciary would have done so.   *See George

v. Kraft Food Global, Inc.*, 641 F.3d 786, 796 (7th Cir. 2011).

In their motion (Doc. 406), Defendants move for summary judgment as to the

Administrative Fee class claim (Section A), Mutual Fund subclasses claim and Small Cap

Fund subclasses claim (together in Section B), and the Company Stock Fund claim

(Section C).   For purposes of clarity, the Court has chosen to address each claim

individually below.

A.  Administrative Fee Class

Plaintiffs assert that the administrative fees paid to State Street/CitiStreet were excessive and that Defendants neglected to solicit competitive bids from 1997 to 2007, which caused the Plan to overpay for administrative services.[4]  Plaintiffs note that the initial 1997 recordkeeping contract provided that if Boeing "determines that such fees or other compensation are in excess of reasonable payment for the services provided by State Street to the Plans, [Boeing] shall notify State Street and the parties shall renegotiate . . . . " (*Id.*; Doc. 213-34, p. 5).  State Street/CitiStreet received two sources of payment through the 1997 administrative services agreement: (1) a $3.50 per-participant annual fee; and (2) uncapped, asset-based "revenue sharing" payments paid by Participants as part of the expense ratios of three mutual funds that Defendants committed to include in the Plan (*See* Doc. 213-34).  State Street/CitiStreet received additional revenue sharing from the SSgA Small Cap mutual fund, the separate account index funds, and it retained "float" interest that accrued on funds pending disbursement (Doc. 408, p. 4).

From all of the above-mentioned sources, State Street/CitiStreet received compensation for its administrative services that equated to a rate of $13.29 per-participant in 1998, $76.26 in 2000, $62.95 in 2001, $50.90 in 2002, $77.13 in 2003, $92.10 in 2004, and $103.11 in 2005 (Doc. 224-39).  Plaintiffs assert that these fees as a

---

[4] In analyzing this argument, the Court, of course, will look to whether the administrative fees were excessive during the applicable limitations period (September 28, 2000 through December 31, 2006) and whether Defendants' failure to solicit bids during this time period was imprudent.   To the extent that the Court references administrative fees prior to September 28, 2000, this is merely to provide the requisite background.

whole were excessive and a result of Defendants' desire to further its corporate relationship with State Street/CitiStreet.   Plaintiffs' expert, Al Otto (who has worked as an independent fiduciary advising 401(k) plans for the last eight years), opined that "the plan overpaid for recordkeeping and administration services by over $35.4 Million for a period from 1997 to 2005."[5]  (Doc. 223-13, p. 13).   Al Otto further opined that a similarly sized plan should have paid no more than $37-$42 per participant per year, whereas Boeing paid State Street/CitiStreet far in excess of that each year from 2000-2005 (Doc. 408, p. 4; Doc. 223-15; Doc. 224-39, p. 2).   Boeing's consultant (TPI)[6] confirmed a market benchmark range of $30.42-$45.42 per-participant (*See* Doc. 260-1, p. 3).

In 2007, after Defendants put the Plan out to competitive bidding, Defendants entered into a new contract under which Participants paid $32 per person in administrative expenses with no revenue sharing (Doc. 223-35, p. 5).   Plaintiffs provide expert testimony that Boeing's failure to open the Plan to competitive bidding from 1996 through 2007 caused the Plan to pay excessive administrative fees.   For example, Plaintiffs' expert Paul Kampner stated in his rebuttal report that "[t]hough Boeing's experts would like us to believe that there is a quantitative way to conclude that the expenses of the Boeing plan were reasonable and appropriate, the company, when discussing a new contract with State Street (CitiStreet) in 2002, refused to take the one certain action that would answer that question:--put it out to bid in a truly competitive

---

[5]Although Al Otto's opinion is flawed for purposes of this analysis because he considered years outside the limitations period in arriving at this opinion, his determination that the Plan's fees were unreasonable and cost the Plan millions of dollars in damages cannot be completely disregarded.
[6] TPI was hired by Defendants in September 2005 to assist with the analysis of the fees that State Street/CitiStreet charged for administration of the defined contribution plans.

process as suggested by its own consultant." (Doc. 223-6, p. 18, ¶48).   Plaintiffs' expert Leonard Garofolo stated in his affidavit that "prudent plan fiduciaries would have periodically conducted a competitive bidding process for the Plan's investment, custodial and recordkeeping business." (Doc. 223-17 at ¶72, 77).

In *George v. Kraft Foods Global, Inc.*, the Seventh Circuit reversed summary judgment on similar facts finding that there was a genuine issue of material fact as to whether the fiduciaries' failure to solicit competitive bids from other recordkeepers was imprudent.   *George,* 641 F.3d at 798.   A reasonable trier of fact could credit these experts' opinions to conclude that Defendants' failure to solicit bids was imprudent. Defendants assert that they relied on its consultant, Mercer, when negotiating new terms with State Street/CitiStreet in 2002 (Doc. 406, p. 11).   As the *George* Court found, however, although reliance on the advice of consultants counts as evidence of prudence, it is not sufficient to entitle defendants to judgment as a matter of law.   *Id*. at 799 (citing *Keach v. U.S. Trust Co.*, 419 F.3d 626, 636-37 (7th Cir. 2005)).

Defendants also argue that Plaintiffs' claim that the administrative fees were excessive is based entirely on the revenue sharing payments made to State Street/CitiStreet and, thus, it is foreclosed by the Seventh Circuit case *Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009) (Doc. 406, p. 12).   But the Court's decision in *Hecker* was not so broad.   The *Hecker* plaintiffs challenged the revenue sharing scheme for an impermissible lack of fee transparency, even though participants received regular account statements outlining the fees charged to the participant's account.   *Hecker*, 556

F.3d 575.   As noted above, the Court held that the *total* fee is the critical figure for someone interested in the cost of including a certain investment in his or her portfolio, not the internal, post-collection distribution of the fee.   *Id.* at 585-86.   Indeed, "[t]he later distribution of the fees by [the plan administrator] is not information the participants needed to know to keep from acting to their own detriment." *Id.*   Thus, the Seventh Circuit found that the omission of the information regarding the revenue-sharing arrangement was not a breach of the defendant's fiduciary duty.

As to the plaintiffs' argument that the defendant breached its fiduciary duty by selecting investment options with excessive fees, the Seventh Circuit considered the fact that the *Hecker* plan offered more than twenty retail class mutual funds and over twenty five hundred funds available to the general public.   The Seventh Circuit noted,

> Importantly, all of these funds were also offered to investors in the general public, and so the expense ratios necessarily were set against the backdrop of market competition.   The fact that it is possible that some other funds might have had even lower ratios is beside the point; nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems).

*Id.* at 586.   Central to the Seventh Circuit's holding was the availability of funds to the general public, thus the expense ratios would reflect market pricing.   And, under that particular plan menu, fees were not excessive.   That the *Hecker* ruling was specifically limited to its facts was made clear by the Court in the so-called *Hecker II* opinion.   *See Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009) ("We return, therefore, to the general point made in the [*Hecker I*] opinion: *this* complaint, alleging that Deere chose

*this* package of funds to offer for its 401(k) Plan participants, with this much variety and this much variation in associated fees, failed to state a claim upon which relief can be granted.") (emphasis in original).

*Hecker* makes clear that revenue sharing does not inherently violate ERISA.   In the instant case, however, Plaintiffs assert that Defendant fiduciaries put the mutual funds into the Plan, which generated revenue sharing for State Street/CitiStreet, so that these funds could provide this revenue sharing to State Street/CitiStreet.   Plaintiffs cite to the testimony of various Boeing employees to argue that Defendants either "deliberately steered revenue to State Street or were conveniently oblivious to these excessive fees."[7] (Doc. 408, p. 6).   Further, Plaintiffs here argue that the total fees (or expense ratios) for these mutual funds were excessive.   Additionally, in *Hecker*, there was no argument that the administrative fees were not reasonable.   *See also George v. Kraft Foods Global, Inc.*, 674 F. Supp. 2d 1031, 1048, n. 17 (N.D. Ill. 2009) ("at a fundamental level, *Hecker* says nothing regarding the duty a fiduciary holds with respect to a 401(k) investment plan's administrative services fees.").   Lastly, Boeing's Plan has fewer available investment options than the plan in *Hecker*.   *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 n. 6 (8th Cir. 2009) ("The far narrower range of investment options available in this case makes more plausible the claim that this Plan was imprudently

---

[7] For example, Plaintiffs cite to the testimony of Gary Bland, the Chief Investment Officer who was in charge of monitoring State Street/CitiStreet's compensation until 2001, who testified at his deposition that "[y]ou keep asking me about revenue sharing. I don't know a sprigging thing about revenue sharing." (Doc. 223-18, p. 14).   Gary Wilson, the Boeing employee responsible for the Plan's relationship with State Street/CitiStreet, stated in his deposition that he was not aware of the amount of revenue sharing in the Plan (Doc. 213-7, p. 1; Doc. 223-35, p. 5).

managed.").  Plaintiffs assert that, in contrast to the twenty-three retail mutual funds and the brokerage window (by which the participants could invest in approximately 2,500 mutual funds) offered in *Hecker*, Defendants offered only eleven investment options, and the four mutual funds were deliberately included to benefit Boeing's corporate relationship with State Street/CitiStreet.

Overall, as to the administrative fees claim, the Court finds that factual disputes remain regarding whether Defendants abused their discretion in maintaining Plan options with unreasonably high administrative fees in order to benefit their corporate relationship with State Street/CitiStreet.  Accordingly, the Court denies summary judgment on the issue of administrative fees.

B.  Mutual Fund Subclass Claim

Plaintiffs argue that the Plan offered mutual funds with excessive fees because identical separate accounts were available at a considerably lower cost, such as the separate accounts Defendants included in the Plan before 1997 and after 2006.  Plaintiffs further contend that Defendants offered and maintained these funds in order to benefit Boeing's corporate banking relationship with the State Street/CitiStreet.

The Seventh Circuit has made very clear that ERISA plan fiduciaries are not required to choose institutional funds (separate accounts) over mutual funds.  *See Loomis v. Exelon Corp.*, 658 F.3d 667, 671 (7th Cir. 2011).  Indeed, mutual funds can prove more prudent than institutional funds due to their higher liquidity and the comprehensive securities regulation under which they are governed.  *Id.* at 672-73.

Additionally, "[t]he fact that it is possible that some other funds might have had even lower ratios is beside the point; nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)."  *Hecker*, 556 F.3d at 586.

Here, Plaintiffs allege that Defendants offered mutual funds (such as the Oppenheimer Capital Appreciation Fund, the MS Value mutual fund, the Dreyfus Premier Technology Growth Fund, and the Small Cap Fund) at an excessive cost in order to further its relationship with State Street/CitiStreet.  The Eighth Circuit addressed similar facts in *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009), on a motion to dismiss.  The plan in *Braden* offered participants ten mutual funds, a common/collective trust, Walmart common stock, and a stable value fund.  *Id.* at 589. The plaintiffs in *Braden* alleged that the limited offerings were chosen, despite the availability of better options, for the benefit of the trustee at the expense of the plan participants.  *Id.* at 596.   The Court held that these allegations, if substantiated, could support a claim for breach of fiduciary duty.  *Id.*

Plaintiffs here allege largely the same claim.  First of all, Plaintiffs provide evidence of the less expensive, otherwise identical alternatives.  For example, the Oppenheimer Capital Appreciation Fund was available as a "separate account of the *identical* product (i.e., no change in the investment mandate, holdings or trading restrictions, etc.)" for 25 basis points (Doc. 224-24, p. 2; Doc. 372-8, p. 4).   The mutual fund offered through the Plan charged 75 basis points for fees, of which 25 basis points

were diverted to State Street/CitiStreet for third party administrative services for Boeing

(*Id*.).   The MS Value mutual fund was offered as a separate account for 20 basis points

from Morgan Stanley, whereas the mutual fund collected fees of 89 basis points, which

included 25 basis points to CitiStreet (Doc. 224-36, p. 2).   Likewise, Mellon Institutional

Management offered a separate account for the Dreyfus Premier Technology Growth

mutual fund for 58 basis points, compared to the 86 basis points as a mutual fund in the

Plan (Doc. 224-26, p. 4).   Because Defendants could have obtained separate accounts

from the same managers of the Plan's mutual funds, there would be no need to "scour

the market" as feared in *Hecker*, because identical plan offerings were readily available at

lower cost.

As *Loomis*, *Hecker*, and *Tibble* make clear, however, the mere fact that mutual

funds have higher expense ratios than separately managed accounts does not mean

Defendants breached their fiduciary duties in offering these funds.   *Loomis*, 658 F.3d at

673-74; *Hecker*, 556 F.3d at 586; *Tibble*, 729 F.3d at 1135.   Yet, Plaintiffs argue that the fact

that separate accounts were offered immediately prior to and subsequent to offering

mutual funds, the fact that various Boeing employees admitted that these separate

accounts were superior investment vehicles, and the evidence demonstrating that

Defendants were motivated by corporate self-interest, creates an issue of fact as to

whether mutual funds were in actuality a more prudent choice during the time period

that they were offered.

Plaintiffs point to testimony of Boeing employees to argue that Boeing itself

admitted that separate account alternatives to mutual funds in the Plan were superior investment vehicles to use.   For example, Brad Leak, former senior manager of equities and fixed income at Boeing, acknowledged that Boeing was able to "negotiate better fees" with separate accounts instead of mutual funds (Doc. 223-19, p. 3-4).   Mark Schmid, Boeing's Chief Investment Officer in 2003, testified at his deposition that the advantages of separate accounts as opposed to mutual funds included: "lower fees, better risk management, and lack of funds flow from other investors." (Doc. 223-40, p. 4-5).   Boeing's Annual Fee Update dated December of 2005 provided that a "shift to separate accounts for mutual fund options will reduce overall costs . . . ." (Doc. 224-37, p. 4).

Plaintiffs also argue that Defendants were motivated by corporate self-interest when choosing these mutual funds.   Boeing had many banking arrangements with State Street/CitiStreet, and Boeing is one of State Street/CitiStreet's largest customers (Doc. 223-28, p. 8; Doc. 224-17, p. 2).   The contracts with State Street/CitiStreet demonstrate that the Plan was obligated to include mutual funds in order to provide revenue sharing for the recordkeeping fees (Doc. 213-20, p. 24).   Keith Cardoza, who oversaw Asset Allocation and Investment Strategy for the Plan, testified that: "The chief investment officer said that he would prefer to hire a manager that, you know, was owned by a bank to, you know, help with credit facility for the Boeing Company[.]" (Doc. 224-5, p. 9).   Plaintiffs point to an e-mail where Boeing employee Jane Western warned of the potential conflicts inherent in the type of overlapping relationship that

existed between Boeing and State Street/CitiStreet, but there does not appear to be any follow-up (Doc. 223-19, p. 10-11; Doc. 223-28, p. 7-8; Doc. 223-29, p. 4; Doc. 223-30, p. 8-9). Plaintiffs also cite to deposition testimony of various Boeing employees to demonstrate that Defendants either "deliberately steered revenue to State Street or were conveniently oblivious to these excessive fees." (Doc. 408, p. 6).  For example, Plaintiffs point to evidence indicating that Boeing might not have been aware of all the revenue sharing that State Street/CitiStreet received (Doc. 224-62, Doc. 3; Doc. 223-28, p. 8).   This type of information could be material when evaluating the propriety of the funds that Defendants selected and maintained for the Participants.  *See Leimkuehler v. American United Life Insurance Company*, 752 F. Supp. 2d 974, 984 (S.D. Ind. 2010).

Overall, there are issues of fact as to whether Defendants abused their discretion in including mutual funds in the Plan (from September 28, 2000 through December 31, 2005) and whether these funds were included to benefit its corporate banking relationship with the CitiStreet/State Street.  *George*, 641 F.3d at 796.  In contrast to *Loomis*, Plaintiffs have asserted that these mutual funds were selected to benefit Defendants by furthering their corporate relationship with State Street/CitiStreet.  *See, e.g., Loomis*, 658 F.3d at 671 (noting there was "no reason to think [the defendant] chose these funds to enrich itself at participants' expense").  As this is not the appropriate forum to weigh testimony or evidence, or choose between competing inferences, summary judgment as to the Mutual Fund subclasses claims must be denied.

C. Small Cap Fund Subclass Claim

Defendants also move for summary judgment as to the Small Cap Fund arguing that it is just another attack on revenue sharing.   Plaintiffs argue that the SSgA Small Cap Fund (one of the four mutual funds provided in the Plan) was chosen without regard to prudency and carried excessive fees (Doc. 408, p. 13-14).   According to Plaintiffs, management offered and retained the fund without any consideration; instead, they offered and retained the Small Cap Fund only because of an agreement between Boeing and State Street/CitiStreet (Doc 408, p. 13-14; Doc. 186, p. 28-29). Notably, State Street Global Advisors, "SSgA," is an affiliate of State Street/CitiStreet (Doc. 372, p. 12).   The SSgA Small Cap fund provided revenue sharing of 92.5 basis points to State Street/CitiStreet (Doc. 372-3, p. 4).   As already explained above, there are issues of fact as to whether the mutual funds were maintained in order to benefit Boeing's corporate relationship with State Street/CitiStreet and thus whether Defendants abused their discretion in maintaining this fund.

Plaintiffs have provided factual support to suggest that the fund was imprudently retained throughout the relevant time period (September 28, 2000 and December 31, 2005).   Because factual discrepancies exist relating to the continued offering of the Small Cap Fund, summary judgment must be denied as to the Small Cap Fund subclasses claim.

D. <u>Technology Fund Subclass Claim</u>

Plaintiffs assert that Defendants breached their duty in retaining a Technology Fund that they knew to be excessively risky, undiversified, and imprudent for a

retirement plan.   More specifically, Plaintiffs contend that Boeing offered an imprudently risky concentrated sector fund for the purpose of benefiting a corporate relationship, rather than for the sole benefit of the Participants (Doc. 408, p. 14).   The funds in question, first the Invesco Technology Fund and later the Dreyfus Technology Fund, were comprised of investments concentrated in the technology sector.   The Invesco Fund was initially added to the Plan menu in 1997 and terminated for underperformance later in December 2003.   The Dreyfus Technology Fund was the chosen replacement.

The Seventh Circuit addressed fund selection in *Loomis*, holding that ERISA provides no "rule that forbids plan sponsors to allow participants to make their own choices."   *Loomis*, 658 F.3d at 673.   Quite the opposite, plan sponsors are encouraged to include more choice.   *Id*.   And there is no ERISA fiduciary duty to preclude participants from taking (or foregoing) increased risk in exchange for increased returns. *Id*. at 674-75.   However, nothing in *Loomis* diminishes a plan sponsor's general fiduciary duty to prudently select and retain (or terminate) funds from the plan menu.

Here, Plaintiffs are not merely challenging the offering and retention of a high risk—high reward investment.   They challenge the offering and retention of these particular concentrated funds, in this particular sector, given that particular investment atmosphere.   The question goes to the prudence of the continued offering and retention of these particular funds, not simply high risk—high reward funds in general.

Defendants assert that they regularly monitored the Technology Fund, and once

the Fund manager's performance lagged, it was placed on a "watch list," and the manager was ultimately terminated (Doc. 406, p. 19; Doc. 213-83, p. 7, 9; Doc. 213-42, p. 2-3; Doc. 213-48, p. 2-25).   Plaintiffs, however, point to the testimony of their expert Ross Miller, who opined on the Invesco fund's risks "[coming] home to roost when the fund fell 22.5% in 2000 followed by losses of 45.2% in 2001 and 46.8% in 2002." (Doc. 223-3, p. 10).   Nevertheless, expert Miller opined "[t]he minutes from the meetings of Boeing's Employee Benefit Investment Committee fail to mention either Invesco or its science and technology fund until the twenty-third meeting on August 20, 2003, when Mike Cappetto indicated that the fund was 'being watched.'" (*Id*.).   Moreover, expert Miller opined that "[a]ctions to replace the fund were only initiated after Invesco and its CEO were charged with civil fraud by the SEC and the New York Attorney General on December 2, 2004 . . . ." (*Id*.)

As to the Dreyfus fund, Plaintiffs offer testimony from Boeing management suggesting the decision to replace the Invesco Fund with another concentrated technology sector fund was made to foster a banking relationship with Dreyfus/Mellon (Doc. 224-5, p. 9-13, 15; Doc. 223-13, p. 22).   In the process of determining which fund to use, the Dreyfus Fund was one of three finalists (Doc. 223-13, p. 20).   According to Plaintiffs' expert Al Otto, the Dreyfus Fund "ranked below median vs. its peer group," but the other two finalists had "performed well prior relative to peers prior to this selection process and both outperformed the Dreyfus fund significantly in 2004-2005 time period." (*Id*.).   The Court finds that Plaintiffs have produced sufficient evidence to

create an issue of fact as to whether these technology funds were prudently offered, monitored and retained from September 28, 2000 through December 31, 2005. Therefore, the Court declines to grant summary judgment as to the Technology Fund subclass claim.

E.   The Boeing Company Stock Fund Subclass Claim

Defendants' final argument concerns the continued inclusion of the Boeing Company Stock Fund ("BCSF") as a unitized offering (Doc. 406, p. 18-20).   Specifically, Plaintiffs argue that Defendants mismanaged this BCSF by holding an excessively large cash component, paying unnecessary fees to State Street/CitiStreet for controlling that cash, and failing to remedy the resulting "transactional drag" and "investment drag." (Doc. 408, p. 19-21).   As a unitized fund, plan participants who chose to invest in the BCSF would not hold individual shares of Boeing common stock, but rather units of the fund.   The BCSF invests almost entirely in common shares, however, they also hold a small cash amount, known as a "cash buffer."   The value of the fund is calculated by adding the value of the common stock and the cash buffer.   The Court in *George* provided the following summary:

> The main benefit of unitization is that it allows participants to quickly sell their interests in the funds and either receive distributions or transfer their contributions to other Plan funds.   When a participant initiates a sale of units, Plan administrators use cash from the cash buffer to make an immediate distribution to the participant or to immediately transfer the participant's investment in the [company stock fund] to another Plan fund. Without the cash buffer, the participant could not receive a distribution or reinvest the relevant funds until Plan administrators sold enough stock to fund the transaction – a process that normally takes three business days. Another benefit of unitization is that it allows the Plan to save transaction

> costs by "netting" participant transactions.   Absent unitization, every time a participant initiated either a purchase or sale of stock, the Plan would have to enter the market and pay a brokerage commission and various fees on the associated transaction.   With unitization, the Plan can offset a participant's request to purchase with another participant's request to sell, and the Plan will need to enter the market and pay transaction costs only to the extent necessary to meet a net inflow or outflow of investment in the relevant fund.

*George*, 641 F.3d at 793.

Defendants argue that *per se* challenges to unitized funds are unavailing as unitized company stock funds are "an industry standard for large 401(k)'s" because they provide "increased liquidity, decreased transaction costs and hedging against a declining stock price" (Doc. 406, p. 20).   Plaintiffs' position, however, is not that these types of funds are *per se* imprudent (*See* Doc. 408, p. 21, n. 36).   Instead, Plaintiffs assert that Boeing never "balanced the relevant factors or [made] a reasoned decision" with respect to maintaining the BCSF (Doc. 408, p. 20-21).   *See George*, 641 F.3d at 794.

Defendants also argue that their decision to maintain BCSF was prudent because they chose to unitize the BCSF in order to provide the liquidity necessary for daily processing of Participant transactions, as recommended by its independent consultant (Doc. 406, p. 20).   Defendants further argue that the cash component was monitored to ensure that there was sufficient cash to process trades, but not so much cash to negatively affect returns (*Id.*).

Defendants cite to the Declaration of Tony Michael Cappetto, the former Director of Trust Investments at Boeing, as evidence that the decision to offer the BCSF was prudent (Doc. 406, p. 20).   Mr. Cappetto's declaration provides that State

Street/CitiStreet, the investment manager for the BCSF, informed Boeing that a liquidity cushion (cash buffer) would be required in order for Participants to have daily trading capabilities (Doc. 213-57, p. 2).   Plaintiffs respond that State Street/CitiStreet's advice could not amount to a prudent consideration because they were not an independent authority.   Plaintiffs assert that State Street/CitiStreet had much to gain from Boeing recommending that the fund hold cash because they could collect multiple layers of fees for managing the fund (Doc. 408, p. 20-21).   Specifically, expert Miller testified that "[i]t was greatly to State Street/CitiStreet's benefit to hold Boeing stock as a unitized trust rather than to allow participants to hold stock directly" as "State Street received an additional fee of approximately 18 basis points on all funds held in 'cash.'" (Doc. 223-3, p. 14).   The documents that Defendants cite to in support of the assertion that they chose to unitize the fund based on a recommendation by their independent consultant are mostly all State Street/CitiStreet documents (Doc. 213-58; Doc. 213-59).   As Plaintiffs point out, there is one non-State Street document from Aetna, the Stable Value manager, which says it is Boeing's "long term partner[.]" (Doc. 213-60, p. 2).   Thus, Plaintiffs argue that these consultants cannot be considered "independent" as Defendants suggest.

Finally, Defendants assert that, when presented with the problem posed by institutional drag and transactional drag, they comprehensively reviewed whether to continue offering the BCSF as a unitized fund and impose trading limitations.   They ultimately made the decision to continue offering the fund and not impose trading limitations, but instead, to monitor the trading activity (Doc. 406, p. 21).   When

day-trading activity dramatically increased in August 2005, Defendants implemented trading restrictions (Doc. 406, p. 21).

Investment and transactional drag are well-recognized characteristics of unitized funds.  "Investment drag" describes the effect on fund value when the common stock price rises (or falls), yet the cash value remains stable, thus the total fund value will reflect an amount different from the common stock value.   Where common stock values rise, the unitized fund will "lag" behind, due to the stable value of any cash holdings.   If the value of the stock declines, a unit of the fund will not decline in value to the same extent as a share of stock, since the value of cash is relatively stable.

"Transactional drag" describes the cost associated with trading on a unitized fund.  Participants do not trade directly with common stock in a unitized fund, and a request to buy or sell generally requires a plan administrator to buy or sell shares and pay all of the associated fees with a stock purchase.  Requests to buy or sell are generally "netted" to minimize transactional costs, nevertheless each participant shares in the cost on a pro-rata basis.   Therefore, participants who trade more often generate more fees, but those who trade less frequently still share the cost.

The Seventh Circuit addressed this issue of institutional and transactional drag in *George*.   In *George*, the plaintiffs argued that the defendants should have done something to minimize or eliminate investment drag and transactional drag.  *George*, 641 F.3d at 794.   More specifically, the plaintiffs argued that defendants should have eliminated unitization and the cash buffer or imposed measures designed to reduce the

number of participant-initiated transactions.  *Id*.   In connection with this, the plaintiffs suggested that defendants could have imposed a trading limit that would have limited the number or frequency of the trades participants could make.  *Id*.   The *George* court found, "the record reveals a genuine issue of material fact as to whether Plan fiduciaries made a decision with respect to the proposed solutions to investment and transactional drag.   Likewise, there is a genuine issue of material fact as to whether the circumstances prevailing in 2004 would have caused a prudent fiduciary to make a decision on these matters."  *Id*. at 796-97.

Here, the allegations are similar.  Plaintiffs challenge Defendants' handling of the BCSF's investment and transactional drag, arguing that there is no evidence that Defendants considered changes in order to minimize investment and transactional drag. Defendants cite to the expert report of Lassadi Turke to demonstrate that the highest level of transaction activity that negatively impacted the return of the BCSF as a whole occurred in 2005 (Doc. 349-45, p. 35).   Defendants offer testimony and evidence that Boeing was aware of and considered the drag issues in 2005 and made changes to rectify it in 2006 (Doc. 371-1, ¶8-14; Doc. 371-7; Doc. 371-8; Doc. 371-10; Doc. 371-11; Doc. 371-12; Doc. 271-13).   Up to that point, however, an issue remains whether Defendants prudently considered and addressed the transactional and institutional drag.

Andrew Ward, the current Vice President and Chief Investment Officer for Boeing, stated in his declaration that, in 1996, "express consideration was given to the continued use of a unitized structure for the BCSF and State Street's role in managing the

liquidity portion of the [BCSF]." (Doc. 371-1, p 3).   He also testified that the "Boeing Trust Investments staff received regular reports from State Street regarding the [BCSF], including participant transfer activity, contributions and distributions as well as stock performance and cash flows" from 1999-2004 (*Id*.).

Plaintiffs argue that the evidence (or lack thereof) indicates otherwise.   Plaintiffs provide evidence that the BCSF underperformed during the five-year period ending December 31, 2005, where the cash holdings should have caused it to outperform Boeing stock.   Expert Miller opined that "[a]t a time when the liquidity buffer of the company stock funds should have enhanced the returns, they were in fact over 25% less than the 1.88% return from owning Boeing stock directly." (Doc. 223-4, p. 14).   Thus, Plaintiffs argue that a prudent fiduciary would have investigated this issue of the BSCF exhibiting unusually poor returns and made a decision sooner than 2005.   Plaintiffs also provide evidence that other alternatives were available that would have prevented or reduced these losses during this time period.   For example, Defendants could have offered direct investment in Boeing stock without the cash buffer, they could have maintained the unitized structure while making changes to the Fund (such as waiting a few days for closing), or they could have instituted trading restrictions (as Defendants ultimately did in 2006 in order to eliminate drag) (Doc. 223-3, p. 13-14; Doc. 371-1, p. 5).   According to expert Miller, "[u]ntil about August of 2005, the Plan fiduciaries discussed, but never inquired or took action to determine why the [BCSF] was under performing" (Doc. 223-17, p. 44).   Plaintiffs point to deposition testimony of Brad Leak who testified that

Defendants did not discuss (or he was not aware of any discussions about) allowing
Participants the opportunity to purchase Boeing Company stock directly, which is one of
the possible alternatives (Doc. 23-19, p. 9).   Plaintiffs' expert Ross Miller concluded that
the mismanagement of the BCSF caused the Plan at least three hundred and seven
million dollars in damages (Doc. 223-3, p. 20-21; Doc. 223-4, p. 13).

When considering the evidence as a whole, the Court finds that there are genuine
issues of material fact as to whether the circumstances prevailing from September 28,
2000 through 2005 would have caused a prudent fiduciary to make a decision on these
matters and whether Defendants did in fact make a decision whether to implement
changes to the BCSF in order to reduce or eliminate investment and transactional drag.
The evidence presented here is in contrast to the vigilance that was found on the part of
the defendants in *Tibble* to minimize this same phenomenon.[8]   *But see Tibble v. Edison*,
729 F.3d 1110, 1137 (9th Cir. 2013) ("Because the choice to include unitization was
objectively reasonable as well as informed, and because the evidence establishes that
[the defendants] oversaw the fund as conditions changed, we agree that summary
judgment was proper.").   The parties offer competing inferences as to whether

---

[8] In *Tibble*, the defendants provided evidence, by way of an affidavit, of a specific example of when the
issue was raised, as well as the reasoning behind making the decision to "reduce the cash target."   *Tibble
v. Edison Intern.*, 639 F. Supp. 2d 1074, 1119 (C.D. Cal. 2009) ("For example, in July 2004, the issue of how
much cash should be held in the Edison Stock Fund was raised at a Sub-TIC meeting. [citation omitted]. In
light of the fact that there had been decreased levels of active trading in the Edison Stock Fund, the
Sub-TIC reduced the cash target within the fund to four percent. [citation omitted]. Thus, the evidence
reveals that Defendants prudently managed the amount of cash that was in the Edison Stock Fund.").
Mr. Ward's declaration simply does not provide the same level of specificity as to what Defendants
considered regarding drag issues up until 2005 and it is called into question by expert reports and
deposition testimony.   Considering all the evidence as a whole, the Court finds there to be genuine issues
of fact.

Defendants abused their discretion in continuing to offer the BCSF as a unitized fund and in failing to address the drag issue, and summary judgment is not the appropriate forum to choose between them.   Defendants' motion is denied as to the Boeing Company Stock Fund subclasses claim.

CONCLUSION

For the reasons set forth above, the Court **DENIES** Plaintiffs' Motion to Strike (Doc. 412), **DENIES** Defendants' Motion for Summary Judgment on the Merits (Doc. 406), and **GRANTS in part** and **DENIES in part** Defendants' Motion for Summary Judgment Based on ERISA's Statute of Repose (Doc. 407), as follows:   (1) Defendants' motion is **DENIED** as to the six-year statute of limitations insofar as claims relating to actions or omissions made subsequent to September 28, 2000, are not foreclosed; (2) Defendants' motion is **GRANTED** as to the six-year statute of limitations insofar as claims made prior to September 28, 2000, are foreclosed; and (3) Defendants' motion is **GRANTED** as to the fraud or concealment claim.

A Final Pretrial Conference and Bench Trial will be set by separate order.

**IT IS SO ORDERED.**

**DATED:   December 30, 2014**

**s/ Nancy J. Rosenstengel**
**NANCY J. ROSENSTENGEL**
**United States District Judge**